<hr />

THE STATE v. KENNADE, *Appellant*.

Division Two, May 8, 1894.

1. **Criminal Practice:** INSTRUCTIONS: EXCEPTIONS. Errors in giving and refusing instructions will not be reviewed either in criminal or in civil cases unless excepted to on the trial.

2. ———: MURDER: EVIDENCE: RES GESTÆ. The acts of defendant on trial for murder, just before the homicide and which led up thereto are admissible in evidence as part of the *res gestæ*.

3. ———: ———: DEFENDANT TESTIFYING: CROSS-EXAMINATION. A defendant on trial for murder testifying on his own behalf may be cross-examined as to a written statement made by him a few days after the murder to lay a foundation for his impeachment.

4. ———: ———: ———: ———. So much of said statement as related to a separate and independent felony was properly excluded.

5. ———: DEFENSE OF DWELLING. The fact that the life of the deceased was not patterned on the prohibitory precepts of the decalogue did not lessen her right to defend her dwelling against an armed and turbulent intruder.

6. ———: MURDER: EVIDENCE. Evidence as to the business of the deceased was rightly excluded.

7. ———: ———: ———. So defendant's reason for carrying a revolver was properly excluded.

8. ———: ———: ———. Evidence of the acts of the defendant subsequent to the homicide were inadmissible.

9. ———: ———: ———. Evidence as to the reputation of the deceased for quarrelsomeness was properly rejected, it not being shown that defendant knew it.

10. ———: ———: ———. A defendant who has testified in a criminal case in his own behalf may be recalled by the state for further cross-examination.

*Appeal from St. Louis Criminal Court.*—HON. H. L. EDMUNDS, Judge.

AFFIRMED.

The defendant, a German, indicted for the murder of Cora Thompson, a negress, by shooting her with a pistol, was convicted of that crime in the second degree, his punishment being assessed at twenty years' imprisonment in the penitentiary, and he appeals to this court.

The testimony on behalf of the prosecution was substantially this: On the afternoon of March 20, 1893, defendant was in a saloon on Eighth street, near Clark avenue, in the city of St. Louis. The saloon was called the "Tunnel house," and was frequented principally by negroes. In the rear of the saloon, fronting on an alley, was a small house, one room of which was occupied by the deceased. Defendant was playing pool in the saloon with a negro named Dar-

lington.  A young negro named Morris came in and
was challenged to play by defendant; upon his declin-
ing on the score of having no money, defendant agreed
to pay for the game, and they began to play.   Morris
won, and defendant proposed to play for a quarter.
Another negro present "staked" Morris, and they
played several games, doubling the stakes each time,
Morris winning every game, until the amount at stake
was four dollars, and the stakeholder paid over the
money to Morris, who started to leave the saloon.
Defendant went up to him, and without saying a word,
slapped him, knocked off his hat, and, putting his
hand into his hip pocket, drew out a pistol.   Morris
ran out the rear door, through a gangway, into the
alley near deceased's house, and there asked a colored
woman to go into the saloon and get his hat for him.
Meanwhile defendant put up his pistol, kicked Morris'
hat over the floor, took a drink at the bar, and, in
company with Darlington, went out on Eighth street to
the corner of Clark avenue, and thence to the afore-
said alley.   When they reached the corner of the alley
Morris was standing in the rear of the saloon, waiting
for his hat.   Defendant immediately started toward
him, putting his hand in his pistol pocket, and Morris
ran past the deceased's house to a vacant lot, and
thence back to Eighth street.

The deceased was in her room at the time, enter-
taining a visitor, a negro woman named Reynolds.
The door of the room was immediately on the alley,
about a foot above the level of the pavement, and had
a single stone step in front of it.   Hearing a noise in
the alley, and some one shouting, "Run, run!" both
women went to the door, and just then defendant came
up to the door and cried out, "Let me in!"   Deceased
said, "What do you want in here?"   Defendant
replied, "I want to get that nigger out of here."

Deceased said, "There is no nigger in here; you may look in, but you can't come in." He tried to force his way in, placing his foot on the stone step, when deceased picked up a seashell from her bureau, and raising it in her hand, said, "If you come in here, I'll knock you in the head." Defendant stepped back, and the woman closed the door; he drew out his pistol, advanced, fired twice through the door, and then forced the door open and fired directly at the woman, who fell, shot through the heart, and died almost instantly.

The defendant, testifying in his own behalf, stated substantially as follows: He dropped into the "Tunnel house" to speak to the barkeeper, who was a friend of his; he was himself a bartender, going on duty at five o'clock in the afternoon; he had a revolver in his pocket, belonging to another man, on which he had loaned a dollar, and had been carrying it two or three weeks. He got to playing with Morris, and lost $4, when he concluded it was time to stop; Morris wanted him to play some more, and caught hold of him, and tried to pull him over to the pool table, when he slapped Morris with the back of his hand; Morris ran out the back way, and his hat "flew off;" he kicked the hat out the back door, and then went up to the bar and talked to the barkeeper several minutes; he denied drawing the pistol out in the saloon. When he left and reached the corner of the alley he saw Morris, and started toward him for the purpose of asking him to come over to his own saloon and play with him, so he could have a chance to win his money back, but Morris ran away (defendant said) into the deceased's house; he went up to the door and saw deceased standing there; he asked her, "where did that nigger go that ran in here?" she told him he wasn't in there, then picked up a seashell from behind her, and said to him, "You son of a bitch, get away from me, or I'll kill you

with this!" He "got scared" and pulled out a police whistle and blew it; he put one foot on the step; he saw a white man in the room standing behind deceased; "it seemed to him like" this man handed her a "gun," and she threw the gun up at his face, and snapped the trigger twice at him; the weapon did not explode; he was a foot and a half or two feet from her, right in front of the door; he then pulled out his gun and shot at her; she fell back into the house; the door was shut; he was "scared of 'em coming out," so he shot through the door twice and moved away from there.

On cross-examination he stated that the door of the house was about half-way open, and Cora stood in the half-open door facing him; he could not say whether the pistol was handed to her or not, but she snapped it at him twice, holding it in her left hand while she still held the seashell in her right, and with the left hand raised; the doorsill was about a foot higher than the level of the alley; they were only two or three feet apart; the woman never moved her position until she fell, after his shot; he was standing toward the south side of the door, facing northwest toward her, and she was facing southeast directly toward him.

The autopsy revealed that the deceased was of delicate frame and above medium height, being five feet, four inches tall; the bullet entered on the left side of the chest about two inches to the left of the median line, between the third and fourth ribs, passing diagonally across the chest to the right, penetrating the left side of the heart near the entrance of the aorta, perforated the middle lobe of the right lung and struck the fifth rib on the right side.

Having laid the foundation for impeachment, the state offered in rebuttal a written statement made and signed by defendant in the police office about a half

hour after his arrest, as follows: "I was playing pool
with a young colored man; I beat him at the game,
when, instead of paying for the game he had lost, he
ran out of the saloon by the rear;    *    *    *    when I
got to the alley, I saw him standing in the alley south
of me; as soon as he saw me he ran into a house in
the alley;    *    *    *    I walked toward the house to see
where he had gone to; when I got to the house I
looked in, when a colored woman came to the door
with a seashell in her hand and threatened me, and
told me I had better get out, in reply to my question
as to where the colored man had gone to; as I still
stood there, she went back and immediately came out
with a revolver which she pointed at me, when I drew
my own revolver and shot her, as I did not want to
take any chances; at the time I shot her I was walking
away south on the alley toward Spruce street, and was
perhaps about ten or fifteen steps away; she then dis-
appeared in the doorway.

*    "And an unknown white man came to the door,
revolver in hand. He came out into the alley and
started towards me. He snapped the revolver at me,
but it did not go off and seeing that I was in danger of
being shot by him and not wishing to take any
chances, I fired at him and he fell down in the alley.
I fired four shots at the woman and two shots at the
man. Almost immediately after the last shooting I
was arrested by an officer and brought to the Four
Courts. This statement is made of my own free will
without any compulsion from any one.

"(Signed)    LOUIS KENNADE.

"Witnessed by
    "WM. H. WILLIAMS, Detec. Dept.
    "THOMAS CONLON, Police Off. Cent. Dis.
    "JAMES J. RICE, Police Off. Fifth Dis.
    "ARCHIE T. EDMONSTONE."

Defendant objected to this statement being read in evidence without the whole of it were read; but the court refused to allow to be read only that portion of the statement which is above the asterisk. The. foregoing, except some testimony as to the good character of defendant, is substantially all the material testimony offered.

The instructions of the court were on murder in the first and second degrees, manslaughter in the fourth degree; on the theory of imperfect self-defense, on self-defense, defendant's testimony, credibility of witnesses, good character and reasonable doubt. Defendant asked the court to give certain instructions which were refused. No exceptions were saved by defendant either to the giving of instructions or to their refusal.

*Charles T. Noland* for appellant.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The instructions given by the court covered the whole law of the case, were as favorable to the appellant as the evidence permitted, and were in the most approved form. The instructions refused were properly refused. Appellant, however, is in no position to complain, as he saved no exception to the giving or refusing. It is not enough to except to instructions for the first time in the motion for a new trial. *State v. Rambo*, 95 Mo. 462; *State v. Griffin*, 98 Mo. 672; *State v. Reed*, 89 Mo. 168. The same rule applies to refused instructions. *State v. Bayne*, 88 Mo. 604. The motion for new trial does not suggest the refusal of instructions as a ground of error. (2) The court committed no error in the admission of any testimony over appellant's objection. (3) The court

committed no error in the exclusion of any testimony offered by the appellant. (4) The question by appellant of the officer as to what was the reputation of deceased, while she was alive, for peacefulness, as a law-abiding citizen, was properly objected to and the objection rightfully sustained. *First*. Because it was not shown that the officer knew what her reputation was. *State v. Cox*, 67 Mo. 392; *State v. Brady*, 87 Mo. 143.. *Second*. Because in this case her reputation was immaterial. The mere fact that one is a bad or quarrelsome person is no excuse for killing him. *State v. Hardy*, 95 Mo. 455. (5) The theory on which the quarrelsome or dangerous character of a deceased may be shown is that because of defendant's knowledge of that fact, he may more reasonably apprehend danger to life or limb by reason of threats or demonstrations made against him by deceased. *State v. Hicks*, 27 Mo. 588; *State v. Brown*, 63 Mo. 439; *People v. Lamb*, 41 New York, 360. The state had a right to recall defendant for further cross-examination, for the purpose of impeaching him. *State v. Jones*, 64 Mo. 391.

SHERWOOD, J.—I. The instructions given at the instance of the state, covering, as they did all the points heretofore mentioned, left nothing to be desired, and were all that were necessary. Indeed it may safely be said that the instructions given were far too favorable for defendant. Whether they were or not, however, does not matter, since defendant did not except to any of the instructions given, nor to the refusal of those refused, so that this case stands here just as if it were a civil case in which no exceptions had been saved; for the saving of exceptions occupies the same plane in criminal as in civil cases. *State v. Foster*, 115 Mo. 448, and cas. cit.

II. Nor was error committed in admitting any testimony over defendant's objection as to what happened at the saloon. The occurrences in the saloon just a few minutes before the homicide, as related by Bass, elucidating as they did, the subsequent criminal transactions and giving to them their proper complexion and expression, constituted part of the *res gestæ* and were therefore competent evidence. Alluding to the rule excluding hearsay, an author of eminent and acknowledged authority, says: "The principle does not extend to the exclusion of any of what may be termed real or natural facts and circumstances in any way connected with the transaction, and from which any inference as to the truth of the disputed fact can reasonably be made." 1 Starkie's Ev. [6 Ed.], 64.

Without the testimony of what occurred at the saloon being introduced, subsequent events resulting in the tragedy which forms the basis of the present prosecution could not have been rightly understood or readily comprehended. One of the most important things to know in the whole matter to be investigated was the *quo animo* the defendant began the quarrel with Morris, in order to understand why he was prepared to push matters to such an extremity as the sequel demonstrated he was. A case very much resembling the present one has arisen in Maryland, where a similar point to the one in hand has been ruled in accordance with the views here expressed. *Kernan v. State*, 65 Md. 253. See, also, *State v. Gabriel*, 88 Mo. 631, and cas. cit.

Besides, Morris without objection, had previously been permitted to testify to events concerning which objections were made when Bass came to testify.

III. It was competent to cross-examine defendant as to the written statement already set forth, made and signed by defendant shortly after the perpetration of

the homicide.   It was proper to do this as laying the necessary foundation for impeachment.   Defendant admitted that the statement was voluntarily made by him.   A defendant can be "contradicted and impeached as any other witness in the case."   R. S. 1889, sec. 4218; *State v. Avery*, 113 Mo. 475, and cases cited. And in this connection it is not to be overlooked, that defendant made only general objections to the questions on cross-examination, or what is tantamount thereto, that they were "incompetent, immaterial and irrelevant," which, as remarked by Judge RYLAND on one occasion, is equivalent to saying "I object."

IV.   Objection was made by defendant to the reading of the statement made by him at the Four Courts, unless the whole of it were read.   The court permitted it to be read down to the asterisk, but no further, and in this committed no error, because that portion below the asterisk related to a subsequent and independent felony.

V.   The testimony offered by the question as to the "*business*" of Cora Thompson, the deceased, was properly ruled out.   She had a right to defend her domicile against an armed and turbulent intruder. *Morgan v. Durfee*, 69 Mo. 469.   Such a right could suffer no diminution because in her humble dwelling her mode of life was not patterned after the prohibitory precepts of the decalogue.

VI.   It was wholly immaterial *why* defendant happened to be carrying the revolver with which he did the murder; the only pertinent inquiry in respect to the weapon was whether defendant was justified in using the pistol upon the deceased.

VII.   Defendant had testified for what purpose he had gone into the alley after Morris had been forced by his conduct to run away from the saloon, so that it was unnecessary to repeat the question, and defendant's

conduct *after* he got into the alley showed that his purpose was not to invite Morris to play pool again with him. And whatever his purpose was, even if peaceful, this gave him no right to forcibly enter and search the premises of deceased in order to extend a polite invitation to Morris to play a game with him.

VIII. The inquiry by defendant's counsel as to what he did *after* the homicide, was wholly irrelevant to the issue joined. An answer to such a question could shed no light upon, and afford no illustration of, his previous conduct or purpose, and consequently was incompetent and inadmissible.

IX. It did not appear that the officer *knew* what the reputation of deceased as to peacefulness, etc., was, and this alone was sufficient reason for not permitting him to answer the inquiry. *State v. Brady*, 87 Mo. *loc. cit.* 145.

Even if deceased had a reputation for being quarrelsome and dangerous, evidence of it could not have been received unless it had been previously shown that defendant *knew it*, and therefore might more reasonably apprehend danger in certain circumstances, than if that reputation had been different. As this knowledge of defendant of the reputation of deceased is affirmatively shown by his own testimony not to have existed, an answer to the question asked the officers was correctly denied. *State v. Hicks*, 27 Mo. 590.

X. The right of the state to recall defendant for the purpose of further cross-examination was unquestionable. He stood in that regard just as any other witness. *State v. Jones*, 64 Mo. 396, 397.

XI. In conclusion there is ample testimony in the record before us to warrant a verdict of guilty of murder in the first degree, and the only basis for a verdict of a less grade of crime is the testimony of

defendant himself, *swearing his own neck out of the halter.* No one can read the evidence as preserved in the record, without being abundantly satisfied and impressed that defendant has not been adjudged the degree of punishment he so richly deserves; but the fault lies not with the courts but with the lawmakers. Judgment affirmed.    All concur.