[Crim. No. 2711.  In Bank.—January 23, 1925.]

## THE PEOPLE, Respondent, v. D. B. HOFFMAN, Appellant.

[1] CRIMINAL LAW—MURDER—EVIDENCE—REPUTATION OF DECEASED—OBJECTION—WAIVER.—In a prosecution for murder, where a prosecution character witness was asked if he knew the reputation of the deceased in the community in which he lived for peace and quiet, to which question defendant's counsel objected on the ground that it was incompetent, irrelevant, and immaterial and not proper rebuttal testimony, and that the character of the deceased was not in issue and not raised by the defense, which objection was overruled and the witness, without answering whether he knew the reputation or not, stated that it was good, defendant cannot be held to have waived his objection to the evidence by failure

———

1. See 13 R. C. L. 916–920; 13 Cal. Jur. 693.

to move to strike out the answer on the ground that it was not responsive, it appearing that said motion would certainly have been granted and that the witness would have been permitted subsequently to give in evidence his knowledge of the reputation of the deceased for peace and quiet.

[2] ID.—REBUTTAL—CARRYING WEAPON—PREJUDICIAL ERROR.—In such a case it is prejudicial error to permit the prosecution to introduce in evidence by way of rebuttal over a pertinent and proper objection of the defendant testimony to the effect that a certain witness had never seen the deceased carry a weapon; and the error was not rendered harmless by the fact that the people had previously put in evidence, as they were entitled to do, the plea being self-defense, testimony that, as a matter of fact, the deceased was not armed at the time of the killing.

[3] ID.—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that certain testimony, together with deceased's dying declaration, if believed by the jury, was abundantly sufficient to defeat defendant's claim that the killing was justifiable as an act of self-defense under the doctrine of appearances.

[4] ID.—EVIDENCE—DYING DECLARATION—WHEN ADMISSIBLE.—The requirement of section 1870 of the Code of Civil Procedure that a dying declaration, to be admissible, must have been made by a "dying person" does not mean that it must have been made while the declarant was literally breathing his last. The requirement is satisfied when it is shown that the declarant died as the result of the injury from which he was suffering at the time that he made his declaration, and it is not necessary that he should apprehend immediate and instant dissolution.

[5] ID.—SENSE OF IMPENDING DEATH—PROOF.—The true test of the admissibility of a dying declaration in a prosecution for murder is whether the declarant, at the time when he made the declaration, had abandoned all hope of life so that he believed that death inevitably must follow. This sense of impending death may be shown in any satisfactory mode and it may be proved by the express language of the declarant.

---

3.  Homicide in self-defense, note, 26 **Am. Dec.** 279.

Homicide in self-defense by one who attacks or voluntarily enters into rencounter, note, 109 **Am. St. Rep.** 804.

4.  Dying declarations, what admissible as, and in what cases, note, 86 **Am. St. Rep.** 637.

Admissibility of dying declarations made under sense of impending death, notes, 56 **L. R. A.** 382; 6 **B. R. C.** 238. See, also, 1 **R. C. L.** 527; 13 **Cal. Jur.** 719.

5.  See 1 **R. C. L.** 539; 13 **Cal. Jur. 721.**

[6] ID.—SUFFICIENCY OF PROOF.—In such a case the decedent's statement to the constable that he did not see how he could live, made at a time when he was groaning in agony, restlessly turning over and gasping for breath, is a sufficient indication of such settled hopeless expectation of impending death as to render it admissible as a dying declaration.

[7] ID. — FALSE HOPE OF RECOVERY. — The entertainment by the decedent at a time subsequent to the making of such declaration to the constable of a false hope of recovery would not affect the solemnity of the declaration previously made by him under a sense of impending death.

[8] ID.—INSTRUCTIONS—DISREGARDING DYING DECLARATION.—In such a case it is error to instruct the jury that they are "at liberty" to disregard the dying declaration, if they are not satisfied that it was made under a sense of impending death, and they should be charged that they must disregard it if they are not satisfied that it was made under the circumstances that the law requires; but where such objectionable instruction is immediately followed by one to the effect that if the jury is satisfied, beyond a reasonable doubt, that the declarations of the deceased were made by him under a sense of impending death, they should consider such statements and give them such weight and credit as the jury thinks they are entitled to under the circumstances of the case, the latter instruction removed any possible misunderstanding by the jury.

[9] ID.—EVIDENCE—BELIEF THAT DECEDENT WAS ARMED.—Where there is evidence in such a case tending to show that the defendant believed the deceased to have been armed, it is competent for the prosecution to show that, as a matter of fact, he was not armed at the time of the killing.

[10] ID. — INTENT — CROSS-EXAMINATION. — In such a case it is not error to refuse to permit the defendant on his cross-examination of certain of the people's witnesses to show by them that a certain witness in the presence of defendant and his wife admitted having been in jail in two counties, the evidence being sought as having a bearing on defendant's state of mind at the time of the homi-

6. Declarant's death under inquiry as only ground for admissibility of his dying declaration, notes, Ann. Cas. 1913C, 412; Ann. Cas. 1917A, 612; Ann. Cas. 1918C, 581.

Necessity of expectation of immediate death to render dying declaration admissible, note, 17 Ann. Cas. 287.

Inference from wound or state of illness as to sense of impending death, note, Ann. Cas. 1912C, 85. See, also, 1 R. C. L. 546; 13 Cal. Jur. 721.

8. See 13 Cal. Jur. 731.

9. See 13 Cal. Jur. 638.

cide, by showing that he had reason to suspect that the deceased and his associates were hardened characters, such evidence not being proper cross-examination, and the defendant having testified without objection and without contradiction to the fact sought to be proved.

[11] ID. — IMPEACHMENT OF WITNESS — PENDENCY OF OTHER CASE IN DIFFERENT COUNTY.—In such a case evidence of the pendency of a felony charge against a witness for the purpose of impeaching him, on the theory that his testimony is or may be influenced by a desire to seek the favor or leniency of the court and prosecuting officer by siding in the conviction of the defendant, is not admissible where the prosecution sought to be shown is pending in another county.

[12] ID. — SELF-DEFENSE — BAD REPUTATION OF ASSAILANT — KNOWLEDGE OF.—In such a case, where the one question to be determined is the existence and reasonableness of the belief under which the defendant claims to have acted in self-defense, evidence of the bad reputation of the deceased, or of one whom the defendant believed to be his assailant, is wholly immaterial and inadmissible, unless the defendant first shows that he had knowledge of such reputation.

[13] ID.—REPUTATION FOR PEACE AND QUIET.—The reputation for peace and quiet of the decedent, or of one whom the defendant supposed to be his assailant, is not alone sufficient where the issue is self-defense, but must be coupled with that person's reputation as a violent, turbulent, and bloodthirsty man.

[14] ID. — REPUTATION FOR TRUTH, HONESTY, AND INTEGRITY — BELIEF OF WITNESS.—In such a case where, for the purpose of impeaching a certain witness, a witness for the defendant testified that he knew the former's general reputation for truth, honesty, and integrity in the community in which he lived, and that it was bad, after which the witness was asked whether, knowing such reputation, he would believe the witness under oath, while the question was proper, an order sustaining an objection to the question is not reversible error.

[15] ID. — SELF-DEFENSE — REPUTATION OF DECEASED FOR PEACE AND QUIET — WHEN ADMISSIBLE. — By the great preponderance of au-

---

11.  Evidence admissible to show bias or credibility of witness, note, 82 Am. St. Rep. 25. See, also, 28 R. C. L. 627.

12.  Admissibility of evidence of character or reputation of deceased, notes, 124 Am. St. Rep. 1018; 4 Ann. Cas. 338; 8 Ann. Cas. 357; 11 Ann. Cas. 229; 3 L. R. A. (N. S.) 351. See, also, 13 Cal. Jur. 694.

13.  See 13 R. C. L. 916; 13 Cal. Jur. 693.

14.  Impeachment of witnesses, notes, 15 Am. Dec. 96; 17 Am. Dec. 76; 14 Am. St. Rep. 157. See, also, 28 R. C. L. 629.

thority, evidence on behalf of the prosecution as to the reputation of the deceased for peace and quiet, when it has not been assailed by the accused, is not admissible, though the defendant pleads self-defense and attempts to establish it.

[16] ID.—REBUTTAL—GOOD REPUTATION OF DECEASED.—In such a case the mere fact that the defendant testified that the deceased used violent and profane language did not warrant the prosecution in introducing in rebuttal evidence that the decedent's reputation was good; and it cannot be presumed that the deliberations of the jury were uninfluenced by such incompetent evidence.

[17] ID.—INSTRUCTIONS—UNINTELLIGIBILITY—INVASION OF PROVINCE OF JURY.—In such a case the court did not err in not giving an instruction requested by the defendant which was partly unintelligible and which, if given, would have invaded the province of the jury, whose exclusive duty it is to determine what, if any, weight should be accorded any particular circumstance in the case.

[18] ID.—INTENT—REPETITION OF INSTRUCTIONS.—The refusal of the court, in such a case, to give an instruction requested by the defendant, relating to intent is harmless, where the court fully instructed the jury on that subject in other parts of its charge.

[19] ID.—INDIVIDUAL OPINION OF JURORS.—In such a case the refusal to give an instruction requested by defendant advising the jury that the defendant is entitled to the individual opinion of each juror is held to be insufficient to justify a reversal in view of the other instructions given.

[20] ID.—CONSPIRACY TO COMMIT LARCENY.—In such a case there was no error in refusing instructions requested by defendant defining what is a conspiracy to commit larceny, where there was no evidence that the deceased when shot was intending to commit larceny.

[21] ID.—SELF-DEFENSE—DECLINING COMBAT—INSTRUCTIONS.—In such a case an instruction should not be given which is so ambiguous as to be open to the construction that if the slayer, i. e., the defendant, made an attack which justified the deceased in making a counter-attack in self-defense, the defendant could not avail himself of the plea of self-defense unless he first in good faith declined further combat, where there was no evidence to support any such theory.

[22] ID.—PROCURING ASSAULT.—In such a case an instruction should not be given which is susceptible of the construction that the one who interposes the plea of self-defense cannot avail himself of

17.  See 14 R. C. L. 730.
18.  See 14 R. C. L. 751.
20.  See 14 R. C. L. 784.

such plea if the assault were brought upon him by his own procurement with a view of having it acted upon by his adversary, where there is no evidence to support any such theory.

(1) 16 C. J., p. 880, sec. 2203.    (2) 16 C. J., p. 869, sec. 2186. (3) 30 C. J., p. 314, sec. 560.    (4) 30 C. J., p. 257, sec. 498.    (5) 30 C. J., p. 257, sec. 498, p. 263, sec. 504.    (6) 30 C. J., p. 263, sec. 504. (7) 30 C. J., p. 258, sec. 499.    (8) 16 C. J., p. 943, sec. 2313.    (9) 30 C. J., p. 245, sec. 482.    (10) 17 C. J., p. 335, sec. 3680.    (11) 40 Cyc., p. 2604.    (12) 30 C. J., p. 172, sec. 394, p. 230, sec. 466.    (13) 30 C. J., p. 230, sec. 465.    (14) 17 C. J., p. 333, sec. 3679.    (15) 30 C. J., p. 173, sec. 395.    (16) 17 C. J., p. 275, sec. 3603; 30 C. J., p. 173, sec. 395.    (17) 16 C. J., p. 1061, sec. 2502.    (18) 16 C. J., p. 1063, sec. 2506.    (19) 16 C. J., p. 1052, sec. 2494.    (20) 30 C. J., p. 393, sec. 638.    (21) 30 C. J., p. 382, sec. 627.    (22) 30 C. J., p. 381, sec. 627.

APPEAL from a judgment of the Superior Court of Imperial County and from an order denying a new trial. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Charles E. Scott for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General and J. L. Flynn for Respondent.

LENNON, J.—In this case the defendant was convicted of murder in the second degree. The appeal from the judgment was heard and determined in the first instance by the district court of appeal, second district, second division, which reversed the judgment solely upon the ground that the trial court erred, to the prejudice of the defendant, in admitting in evidence testimony that the reputation of the deceased for peace and quiet was good.

[1] The point is presented for the first time to this court that the answer to the question propounded to the prosecution's character witness, "Do you know his [deceased's] reputation in the community in which he lived for peace and quiet?" was not responsive to the question and, therefore, in the absence of a motion to strike out the answer, the error of the trial court in overruling the objection to the question cannot be availed of by the defendant upon appeal.

The record discloses in this behalf that counsel for the defendant objected to the question propounded upon the ground that the testimony sought to be elicited thereby was, "incompetent, irrelevant and immaterial and not proper rebuttal testimony . . . the character of the deceased not being in issue and not having been raised by the defense." The trial court sustained the objection. Thereupon the district attorney said, "May it please the court, they claim that he [deceased] came at the defendant in a threatening manner." Whereupon the trial court, after having the question read by the reporter, overruled the objection. Thereupon the witness, without saying whether or not he knew the reputation of the deceased in the particular stated, proceeded to, and did, testify that, "Jack [the deceased] had a very good reputation around Pomona for peace and quiet; while I knew him I never knew him to swear in front of a woman in any way; he did not use vulgar language, profane language, at any time I know of."

It is certain that if a motion to strike out the answer upon the ground that it was not responsive had been made it would have been granted. The witness doubtless would then have answered the question in the affirmative and it is equally certain that the trial court, despite the objection, would then have permitted the witness to give in evidence his knowledge of the reputation of the deceased for peace and quiet. The court and the witness were fairly notified by the question propounded, even though it called for a categorical answer, that the purpose of the prosecutor was to establish in evidence the reputation of the deceased for peace and quiet. The witness evidently apprehending that purpose at once answered with the desired response. It will thus be seen that only by a super-technical treatment of the situation could the answer be held to be not responsive, and that it would have been an idle act for the defendant to have moved to strike out the answer. In such a situation it cannot be fairly held that the defendant waived his objection to the evidence complained of.

We are satisfied with the court of appeal's statement of the rule, as it exists in this jurisdiction, relative to the admissibility of evidence concerning the reputation of the deceased for peace and quiet in homicide cases where the

defense of self-defense is interposed.  We are also satisfied
with the conclusion reached by the court of appeal that it
was prejudicial error in the situation presented by the evi-
dence in the instant case, for the trial court to permit in
evidence, over the objection of the defendant, testimony
tending to establish the reputation of the deceased for peace
and quiet.  Conceding that the defendant did seek to assail
the good reputation of the deceased, nevertheless, the fact
remains that he was not permitted to do so and, therefore,
the reputation of the deceased was not in issue.  A review
of the evidence satisfies us that the error of the trial court
in the particular stated contributed materially to the verdict.

A review of the evidence also satisfies us that the court
of appeal was correct in its conclusion that instructions
numbered XIV and XV, which apparently were given upon
the court's own motion, and which, although substantially
correct in the statement of abstract propositions of law,
were inapplicable to the evidence in the case or any issue
raised by the evidence in the case and were, therefore, well
calculated to be misleading and confusing.  The giving of
these instructions was, therefore, error which must in a
measure have contributed to the verdict and the court of
appeal may well have placed its reversal of the judgment
in part upon the giving of these instructions.  (See *People
v. Roe*, 189 Cal. 548 [209 Pac. 560].)

[2]  The ruling of the trial court which permitted the
prosecution to have in evidence by way of rebuttal over a
pertinent and proper objection of the defendant, testimony
to the effect that a certain witness had never seen the de-
ceased carry a weapon was prejudicial error.  (*People* v.
*Powell*, 87 Cal. 348, 362 [11 L. R. A. 75, 25 Pac. 481].)
The error was not rendered harmless by the fact that the
people had previously put in evidence, as they were entitled
to do under the defense made in the instant case, testimony
that, as a matter of fact, the deceased was not armed at the
time of the killing.  While it is true that this testimony
stands uncontradicted by any direct evidence, still defendant
testified that after he fired one shot into the air the deceased
advanced toward him with profanity on his lips and one hand
on his hip pocket as if about to draw a weapon.  Obviously
that was a circumstance which the jury might well have
weighed in determining whether or not the deceased was

unarmed at the time of the killing and the credibility of
the prosecution's witnesses in this particular should have
been left for the determination of the jury without the
fortification of inadmissible evidence. It has been suggested
that the testimony complained of was harmless because it
"could have no effect other than to bolster up the witness'
testimony that" the deceased "was unarmed at the time of
the homicide." That doubtless was its effect and therefore
it must have influenced the jury in accepting, as the truth,
the prosecution's testimony that the deceased was unarmed
at the time of the killing.

Numerous other points have been made in support of
the appeal which have been adequately and correctly dis-
posed of by the court of appeal in an opinion by Mr. Pre-
siding Justice Finlayson, which we hereby adopt as the
opinion of this court:

"The killing, which was admitted, was claimed to have
been done in self-defense. The facts, so far as they are
necessary to an understanding of the questions presented
for our consideration, are substantially as follows: At the
date of the homicide, May 29, 1923, defendant, a man fifty-
three years of age and a rancher in Imperial Valley, was
living with his wife on leased premises. One Donald Cor-
nelison, a lad seventeen years of age, had been employed
by defendant as a ranch-hand, quitting the employment
after having worked but a day and a half. While he thus
was working for defendant Cornelison stated in defendant's
presence that he (Cornelison) had been in jail in Santa Ana
and Los Angeles. At about dusk on the evening of the day
when he quit defendant's employ, Cornelison and two com-
panions, James H. Shell, twenty years of age, and the de-
cedent, also twenty years of age, came to defendant's prem-
ises in an automobile, remaining there about an hour and
a half conversing with one of defendant's ranch-hands.
The three youths took their departure at about 9 o'clock in
the evening. Shortly thereafter defendant, going outside
his house to close a gate, noticed an automobile proceeding
along the highway in a southerly direction. This auto-
mobile, which proved to be the one in which the three young
men were riding, stopped opposite a barley-field leased by
defendant and upon which stood a thresher and tractor
owned by him. When the automobile was seen by defendant

its lights were out.   Cornelison and Shell, called as witnesses
for the prosecution, testified that they had lost a part of the
shock absorber on their car and that they entered the barley-
field to obtain a baling wire with which to make the neces-
sary repairs.   Defendant, seeing the automobile stopped in
the highway and suspecting that its occupants intended
stealing from his tractor or thresher, entered his own auto-
mobile and, accompanied by his wife, drove in the direction
of the other car.   Upon arriving at the place where the
boys' car had been stopped, defendant found it parked close
to a ditch bank on the west side of the highway opposite
the spot where his thresher stood in the barley-field.   In
Imperial county there runs through each highway an eleva-
tion of land about two feet or more in height known as a
'border,' thus dividing the highway into two separate drive-
ways along each of which vehicles are driven.   Defendant
stopped his automobile east of the center of the border
and parallel with the machine which the boys had been
driving.   The succeeding occurrences are variously de-
scribed by the witnesses.   Defendant's version, reduced to
the narrative form, is substantially as follows: ''I got out of
my automobile, and looking in the direction of the thresher
saw two boys walking towards that piece of machinery.   I
did not know where the third boy was.   I stood on the ditch
bank, facing the west, and called to the two boys in the
barley-field to 'come out of there.'   I fired one shot in the
air because the boys crouched down near the thresher.
When I shot in the air the third boy, the decedent, whom
I did not recognize at the time, appeared between the run-
ning-board of their car and the ditch bank and said, 'What
in hell are you doing here?'   Upon this sudden and unex-
pected appearance of the young man I backed down from
the ditch bank toward the easterly portion of the border.
My wife, who had remained in our automobile until after I
fired the shot in the air, stepped out and in front of our
car and said to the deceased, 'What are the boys doing over
there?' to which the decedent replied, 'It is none of your
damned business.'   Decedent came toward me with one hand
on his right hip pocket.   At the same time I was backing
toward the border, while the decedent, advancing toward me,
was making threats that 'he would get me for that.'   As he
advanced in that threatening manner, saying he would get

me, he started to pull his hand out of his pocket, and then I shot him. I believed he had a gun on him. When I shot him he was in front of the two cars—approximately twenty feet from the front of the cars. He had come toward me approximately twenty feet from the first starting place. He was about six feet from me when I shot him.

"The decedent, who was mortally wounded, the bullet having passed through the abdomen and penetrated the liver and stomach, was taken by his two companions to a hospital at Brawley. Later he was removed to a hospital at El Centro to be operated upon. He died at the latter hospital about thirty-six hours after the shooting. At the time of his arrest defendant told the officer, when questioned about the shooting, that he 'had a right to protect his property.' We mention this incident because of its tendency to indicate the defendant's claim that he shot in necessary defense of his person was an afterthought.

"Cornelison, called as a witness for the prosecution, described how he and Shell entered the barley-field and how he started to the thresher for the purpose of finding baling wire with which to repair the broken shock absorber. From this point his testimony, reduced to the narrative form, is substantially as follows: Shell started over to the thresher with me, and we got up there and Shell said he heard something. I told him it was the canvas flapping. After that we heard somebody shout. We turned around and somebody was on the bank saying 'Come out of there.' We started out and got to about where the fence is when I saw Mr. Hoffman, who had gone down off the bank. I saw John Schafer (the decedent) leaning with his right hand on the fender of his own car and the other hand on his side. I don't know what was said or anything, but I saw Mr. Hoffman swing about halfway around and shoot Schafer, who exclaimed, 'I am shot.' Schafer climbed into Mr. Hoffman's car in the back seat. I ran on through the fence and Mr. Hoffman pulled the gun on me and said, 'What devilment are you fellows up to?' I told him we were getting some baling wire. He said, 'No, you are up to some devilment.' I told him it was for the shock absorber and I would show it to him. Schafer asked him to take him to the doctor. Mr. Hoffman told me to get Schafer out of his car and take him to the doctor. Shell and I took

195 Cal.—20

Schafer out of Mr. Hoffman's car and took him to the doctor. This witness, upon being asked if he knew of his own knowledge whether the deceased had any weapon on his person, replied that 'he absolutely had not.'

"A constable who conveyed the deceased in an automobile from the Brawley hospital to the El Centro hospital, and who detailed a dying declaration made to him by the mortally wounded youth, testified substantially as follows: The boy, who was groaning all the time and turning over and gasping for breath, said to me: 'I don't see how I can live. I don't see why he shot me; I never knew the man.' On being asked to state what the deceased told him in the course of his dying declaration, the constable further testified as follows: 'Well, he told me that he met this boy (Cornelison) in Brawley that morning, and they went back to Poppy (defendant's premises) to look for a job; . . . and they left there and came down the road and broke a shock absorber on the car, and when they got down to the machine (the thresher) this boy (Cornelison) said he knew where there was some wire, and he (decedent) stayed with the machine (the boy's automobile), sitting on the running-board of his own car, and one of the other boys started out in the field, and just as he got started the other boy (Shell) said, 'I will go with you'; and they went out there and they hadn't been gone but a little bit until Mr. Hoffman drove up and stopped his machine, and he wanted to know of this boy (decedent), he said, 'What are you doing here?' and this boy said, 'The other boys went out in the field to get some wire at the fence, to get some wire, to fix the shock absorber,' and Mr. Hoffman said, 'No, you are up to some devilment here'; and the boy (decedent) said he just kind of stepped up off the car and Hoffman got out of his car; got out of the car and came around this way, and the boy stepped up off of the car, and that is when he shot him.' The constable further testified that he asked the deceased if he and the defendant had had any quarrel, and that the boy replied that they had not had a word—that he had never seen Mr. Hoffman before that night.

[3] "Coming now to a consideration of the questions in the order of their presentation: Appellant's first point, the asserted insufficiency of the evidence to sustain the verdict, is not well taken. Appellant's claim that the killing was

justifiable because it appeared to him, as a reasonable man that his life was in danger when, as he says, he saw the decedent draw his hand from his rear hip pocket, is completely overcome by Cornelison's testimony that immediately prior to the shooting the deceased was leaning with his right hand on the fender of his own car and with his other hand on his side. This testimony, together with decedent's dying declaration, if believed by the jury—as we must assume it was—is abundantly sufficient to defeat defendant's claim that the killing was justifiable as an act of self-defense under the doctrine of appearances.

[4] "The court did not err in admitting the dying declaration in evidence. It is claimed that no sufficient foundation was laid. The requirement of section 1870 of the Code of Civil Procedure that the declaration, to be admissible, must have been made by a 'dying person' does not mean that it must have been made while the declarant was literally breathing his last. The requirement is satisfied when it is shown that the declarant died as the result of the injury from which he was suffering at the time when he made his declaration. It is not necessary that he should apprehend immediate and instant dissolution. (1 R. C. L., tit. 'Admissions and Declarations,' par. 81, p. 538; *People* v. *Cord*, 157 Cal. 562 [108 Pac. 511].) [5] The true test is whether the declarant, at the time when he made the declaration, had abandoned all hope of life so that he believed that death inevitably must follow. This sense of impending death may be shown in any satisfactory mode. It may be proved by the express language of the declarant. In *State* v. *Lewis*, 264 Mo. 427 [175 S. W. 61], it is said: 'It is elementary that dying declarations are admissible when made under an impression of impending death. . . . It is enough if it satisfactorily appears in any mode that they were made under that sanction, whether it be directly proved by the express language of the declarant or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind.' [6] Decedent's statement to the constable that he did not see how he could live, made at a time when he was groaning in agony, restlessly turning over and gasping for breath, is a sufficient indication

of such settled hopeless expectation of impending death as
to render it admissible as a dying declaration. (See *People
v. Ramirez*, 73 Cal. 403 [15 Pac. 33] ; *People* v. *Dobbins*, 138
Cal. 694 [72 Pac. 339] ; *People* v. *Cord, supra.*) The authori-
ties cited by appellant are not in point. In the case upon
which chief reliance seems to be placed, *People* v. *Hodgdon,*
55 Cal. 72 [36 Am. Rep. 30], the deceased, in a written
declaration  signed by her, stated that she realizes that she
'may' not recover, thus betokening a lingering hope of pos-
sible recovery. But when a dying person declares that he
does not see how he can live, he in effect declares that he
cannot see even the ray of hope and that he fully believes
the hand of death is upon him. It is of no moment that
in a subsequent statement to his mother the dying youth
employed language which appellant construes as indicative
of a revived hope. [7] If it be conceded that at a time
subsequent to his declaration to the constable the decedent
entertained a false hope of recovery, that would not affect
the solemnity of the declaration previously made by him
under a sense of impending death. (*People* v. *Cord, supra.*)

[8] "A portion of an instruction given by the trial court
upon the subject of dying declarations was substantially in
the language which was condemned by the district court of
appeal in *People* v. *Profumo*, 23 Cal. App. 376 [138 Pac.
109]. In that case it was held that it is error to advise the
jurors that they are 'at liberty' to disregard the declara-
tion if they are not satisfied that it was made under a
sense of impending death. They should be charged that
they *must* disregard it, not that they 'are at liberty' to
disregard it, if they are not satisfied that it was made under
the circumstances which the law requires. In the instant
case, however, the objectionable language was immediately
followed by these words: 'If you are satisfied, beyond a
reasonable doubt, that the declarations of John A. Schafer
. . . were made by him under a sense of impending death,
then you should consider such statements and give them such
weight and credit as you think they are entitled to under
the circumstances of the case.' This portion of the instruc-
tion removed any possible misunderstanding by the jury.
(*People* v. *Singh,* 182 Cal. 477 [188 Pac. 987].)

"The court did not err in admitting in rebuttal the testimony of Doctor Parker. It was admitted, quite properly, to rebut certain testimony of the defendant and his wife.

[9] "Over the objection of defendant, the prosecution, when putting in its rebuttal evidence, was permitted to prove by James Shell, one of decedent's companions, that at the time of the homicide Schafer had no weapon on his person or in the car. There was no error here. Where there is evidence tending to show that the defendant believed the deceased to have been armed, it is competent for the prosecution to show that, as a matter of fact, he was not armed at the time of the killing. (*People* v. *Powell*, 87 Cal. 362 [11 L. R. A. 75, 25 Pac. 481]; *People* v. *Sehorn*, 116 Cal. 503, 509 [48 Pac. 495]; *People* v. *Adams*, 137 Cal. 580 [70 Pac. 662].) . . .

[10] "Appellant complains that he was not permitted on his cross-examination of certain of the people's witnesses to show by them that Cornelison, in the presence of defendant and his wife, admitted having been in jail in Los Angeles and Orange counties. We are told that this evidence was not sought for the purpose of impeaching Cornelison, but that it was admissible as having a bearing upon defendant's state of mind at the time of the homicide, by showing that he had reason to suspect that the deceased and his associates were hardened characters. The answer to this claim is twofold: In the first place, the matter thus sought to be admitted was not a proper subject of cross-examination; it bore no relation to any of the matters testified to by the witness on his direct examination. In the second place, defendant, when presenting his defense, testified without objection that Cornelison, in the presence and hearing of himself and wife, had stated that he had been in the county jail in Los Angeles County and also in Orange County. Defendant's testimony in this regard was not contradicted by any witness.

[11] "Defendant sought to impeach Cornelison by offering evidence to show that since the date of the homicide an information charging him with a felony was filed in the superior court of Orange County, and that the charge was then pending. The court sustained an objection to the offer, and the ruling is now assigned as error. It is claimed that the evidence was admissible under the doctrine announced

in *People* v. *Dillwood*, 4 Cal. Unrep. 973 [39 Pac. 438], where it was said that it is compctent to show that other criminal charges are pending in the same court against a witness for the prosecution, not as evidence of particular wrongful acts—for as to these he is presumed to be innocent —but as a circumstance tending to show that his testimony is or may be influenced by a desire to seek the favor or leniency of the court and prosecuting officer by aiding in the conviction of the defendant. The reason which justified the admission of such evidence in the Dillwood case is absent from the present case. Here the prosecution was being conducted by the district attorney of Imperial County in the superior court of that county. We fail to perceive how the fact that a criminal charge was pending against Cornelison in another county could reasonably be expected to influence him while testifying as a witness for the prosccution in Imperial County. We cannot see how the fact that he gave testimony for the prosecution in Imperial County could have led him to expect favor or leniency from any of the Orange County officials.

[12] "Appellant assigns as error the refusal of the court to permit him to show that Cornelison bore a bad reputation for peace and quiet at Pomona, Los Angeles County, and also in Orange County. It was not claimed that defendant had ever lived in either of those communities, or that he had any actual knowledge of Cornelison's reputation in either of those places. It is argued that because the night was dark defendant had reason to apprehend that Cornelison might be the one who was confronting him as he fired the fatal shot. But even if Cornelison had been the person who faced defendant when, as he claims, he fired in self-defense, evidence of the former's bad reputation for peace and quiet could not have been reccived unless it also were shown that defendant had knowledge of it. If defendant had learned of Cornelison's bad reputation in Pomona and in Orange County, then and only then would he have had greater reason to apprehend danger than if that reputation had been different. Where the only question to be determined is the existence and reasonableness of the belief under which the defendant claims to have acted in self-defense, evidence of the bad reputation of the deceased, or of one whom the defendant supposed to be his assailant, is wholly

immaterial and inadmissible unless the defendant first shows that he had knowledge of such reputation. (*State* v. *Kennade*, 121 Mo. 405 [26 S. W. 347]; *State* v. *Rollins*, 113 N. C. 722 [18 S. E. 394]; *Commonwealth* v. *Straesser*, 153 Pa. St. 451 [26 Atl. 17]; *State* v. *Blassengame*, 132 La. 250 [61 South. 219].) Since there was no evidence, that Cornelison's reputation had followed him to Imperial County, there is no presumption that defendant knew of it. (*State* v. *Blassengame*, *supra*.) **[13]** Moreover, there is respectable authority for the proposition that the reputation for peace and quiet of the decedent, or of one whom the defendant supposed to be his assailant, is not alone sufficient where the issue is self-defense, but must be coupled with that person's reputation as a violent, turbulent, and bloodthirsty man. (*Tribble* v. *State*, 145 Ala. 23 [40 South. 938]; *King* v. *State*, 17 Ala. App. 381 [85 South. 876].)

**[14]** "For the purpose of impeaching Cornelison, a witness for defendant testified that he knew the former's general reputation for truth, honesty and integrity in the community in which he lived, and that it was bad. The witness was then asked by defendant's counsel whether, knowing such reputation, he would believe Cornelison under oath. The court sustained an objection to the question. That ruling is now assigned as error. It was held in *People* v. *Corey*, 8 Cal. App. 726 [97 Pac. 907], that such a question may properly be asked; but the ruling, if erroneous, is not reversible error. (See *People* v. *Love*, 29 Cal. App. 525 [157 Pac. 9].)

**[15]** "We come now to what we conceive to be the most serious error in the record—one which, we are constrained to hold, necessitates a reversal and a retrial. The defendant having testified that the deceased, when approaching him, used violent and profane language, the prosecution was permitted to show in rebuttal, over defendant's objection, that the deceased was not in the habit of using violent or profane language, and that his general reputation for peace and quiet was good. By the great preponderance of authority, evidence on behalf of the prosecution as to the reputation of the deceased for peace and quiet, when it has not been assailed by the accused, is not admissible though the defendant pleads self-defense and attempts to establish it. (124 Am. St. Rep. 1034, 1035, note to *State* v. *Thompson;*

*People* v. *Bezy,* 67 Cal. 223 [7 Pac. 643]; *People* v. *Powell, supra.*) No general rule can be laid down for the determination of what will be held to constitute an attack by the defendant on the reputation of the deceased so as to 'open the door' for rebuttal on behalf of the prosecution. Each case must be decided according to its own facts. (13 R. C. L., tit. 'Homicide,' par. 219, p. 917; *Kelly* v. *People,* 229 Ill. 81 [11 Ann. Cas. 226, 12 L. R. A. (N. S.) 1169, 82 N. E. 198].) **[16]** We have been unable to find any authority which sustains the view of the attorney-general that the mere fact that the defendant testified that the deceased used violent and profane language warranted the prosecution in introducing in rebuttal evidence that the decedent's reputation was good. On the contrary, the authorities are the other way. (*Bowles* v. *Commonwealth,* 103 Va. 816 [48 S. E. 527]. See, also, *DeWoody* v. *State,* 21 Ariz. 613 [193 Pac. 299].) It cannot be presumed that the deliberations of the jury were uninfluenced by this incompetent evidence. 'We cannot presume,' says the Arizona supreme court in *DeWoody* v. *State, supra,* 'that the evidence of the good character of the deceased had no influence on the deliberations of the jury (17 Cor. Jur. 275), and we are satisfied that the admission of such evidence over the objection of the defendant was reversible error.' In a recent decision by our own supreme court it is said that 'when it clearly appears that a verdict of conviction is based upon incompetent evidence which was admitted over the objection of the defendant, . . . we must conclude that the judgment resulting therefrom involved a miscarriage of justice.' (*People* v. *Frank,* 193 Cal. 474 [225 Pac. 448].)

**[17]** "The court did not err in refusing to give defendant's requested instruction No. IV. This instruction, besides being unintelligible in some of its parts, would, if given, have invaded the province of the jury, whose exclusive duty it is to determine what if any weight shall be accorded any particular circumstance in the case.

**[18]** "The refusal to give defendant's requested instruction No. V, relating to intent, was harmless. The court fully instructed the jury upon that subject in other parts of its charge. (See *People* v. *Streuber,* 121 Cal. 431 [53 Pac. 918].)

[19] ''The refusal to give defendant's requested instruction No. IX, advising the jury that the defendant is entitled to the individual opinion of each juror, is insufficient to justify a reversal in view of the other instructions given. (*People* v. *Perry,* 144 Cal. 748, 756 [78 Pac. 284]; *People* v. *Plumeyer,* 54 Cal. App. 786 [202 Pac. 888]; *People* v. *Quon Foo,* 57 Cal. App. 237 [206 Pac. 1028].)

[20] ''The court properly refused to give defendant's requested instructions Nos. XVII and XVIII, defining what is a conspiracy to commit a larceny. The instructions were requested upon the theory that there was evidence tending to show that Cornelison, Shell and the deceased had conspired to commit a larceny of defendant's personal property. But even so, the killing of Schafer was not an act committed in defense of property against one who manifestly was intending or endeavoring to commit a larceny by violence or surprise. 'Homicide,' says the Penal Code, 'is justifiable . . . when committed in defense of . . . property . . . against one who manifestly intends or endeavors, by violence or surprise, to commit a felony.' (Subd. 2, sec. 197.) There is in the facts of this case no room for the theory that the deceased, when shot, manifestly intended or was then endeavoring 'by violence or surprise,' to commit a larceny, grand or petit. For reasons equally cogent it was not improper to refuse to give defendant's requested instruction No. XIX. The other instructions requested by defendant and refused by the court, in so far as they are applicable to the facts of this case, were fully covered by those which were given.

[21] ''The court's instruction No. XIV should not have been given in the form in which it was cast. It is misleading. It is so ambiguous as to be open to the construction that if 'the slayer,' i. e., the defendant, made an attack which justified the deceased in making a counter-attack in self-defense, the defendant could not avail himself of the plea of self-defense unless he first in good faith declined further combat. There is no evidence to support any such theory. [22] So, also, the court's instruction No. XV is susceptible of the construction that the one who interposes the plea of self-defense cannot avail himself of such plea if an assault were brought upon him by his own procurement with a view of having it acted upon by his adversary. There is no evi-

dence to support any such theory, and the instruction was calculated to confuse the jury.

"Complaint is made of certain other instructions given by the court, but those instructions, as a whole are fully as favorable to the defendant as he, under the evidence, was entitled to have given to the jury.

"Other points are presented by appellant, but in view of the fact that the judgment, because of the reversible error above noted, must be reversed and the cause must be remanded for a new trial, it will not be necessary to consider these other matters, for they are not likely to arise on the retrial."

The judgment and the order appealed from are reversed and the cause is remanded for a new trial.

Richards, J., Shenk, J., Seawell, J., and Waste, J., concurred.

MYERS, C. J., Dissenting.—I dissent.

I am in accord with the reasoning and conclusions of the opinion of Mr. Presiding Justice Finlayson except as to the portions thereof which refer to the admission in evidence of testimony concerning the good reputation of the deceased and those which refer to the giving of instructions numbered XIV and XV. I concede that the trial court erred in overruling defendant's objection to the question, "Do you know his [deceased's] reputation in the community in which he lived for peace and quiet?" This was erroneous, if for no other reason, because the question did not refer to the *general* reputation. It is plainly apparent, however, that the defendant could not have been injured or prejudiced by any answer which would be responsive to this question. Such an answer could only be "yes" or "no," coupled, perhaps, with an explanation of the nature and extent of the witness' knowledge upon this subject. Conceding this to have been immaterial it could not have injured the defendant. If a categorical answer had been insisted upon it might well have been in the negative and this would have ended the inquiry. On the other hand, if the answer had been in the affirmative the defense would then have been entitled to cross-examine the witness upon *voir dire* to ascertain the nature and source of the witness' knowledge and this might

have disclosed the fact that the witness was not qualified to testify upon this subject. Either of the foregoing situations would have resulted in the exclusion of the testimony here complained of. The prevailing opinion concedes that if a motion to strike.out the answer upon the ground that it was not responsive had been made it would have been granted. Inasmuch as neither party made such motion the trial court was fully justified in concluding that both parties were content that this answer should remain in the record and before the jury. I think, therefore, that the defendant is now foreclosed from contending upon appeal that he was prejudiced by this ruling. In order to conclude that he was so prejudiced the prevailing opinion is compelled to assume two states of fact: First, that if a categorical answer had been required of the witness it would have been in the affirmative; second, that the defense would then have refrained from cross-examining the witness upon *voir dire* or that such cross-examination would have been ineffective. But it has been the settled law in this state ever since the adoption of section 4½ of article VI of the constitution that, upon appeal, injury or prejudice cannot be presumed or assumed from the mere fact of error. Such injury and prejudice must affirmatively appear from an inspection of the record before it can justify a reversal (*People v. O'Bryan,* 165 Cal. 55 [130 Pac. 1042]; *Vallejo etc. R. R. Co. v. Reed Orchard Co.,* 169 Cal. 545, 554 [147 Pac. 238]; *People v. Mazzurco,* 49 Cal. App. 275, 280 [193 Pac. 164]; *People v. Chapman,* 55 Cal. App. 192, 201 [203 Pac. 126]; *People v. McCalla,* 63 Cal. App. 783, 797 [220 Pac. 436]). I am in full accord with the rule announced by this court in *People v. Frank,* 193 Cal. 474 [225 Pac. 448], that "*When it clearly appears* that a verdict of conviction is based upon incompetent evidence which was admitted over the objection of the defendant . . . we must conclude that the judgment resulting therefrom involves a miscarriage of justice. (Italics mine.) It did so "clearly appear" in that case because the incompetent evidence was absolutely essential to sustain the verdict. The evidence here complained of may be eliminated without in the least impairing the sufficiency of the remaining evidence to sustain the verdict of conviction, and, therefore, it does not appear herein that the verdict is based upon incompetent evidence.

I am unable to concur with the conclusion that the trial court erred in giving instructions XIV and XV. It is conceded that they correctly state the law, but it is said that they should not have been given for the reason that they are inapplicable to the evidence in the case or to any issue raised by the evidence and were, therefore, well calculated to be misleading and confusing. I think that they both were applicable to the evidence and to issues raised by the evidence and were properly given. It must be conceded that the defendant made the first assault. He admits that he fired the first shot while the deceased was sitting quietly upon the running-board of his automobile and before the latter had made any move or declaration whatsoever. To be sure, the defendant declares that he fired this shot in the air, but the jurors were not compelled to believe this statement, and even if it be true the deceased could not know in the darkness that the shot was not fired at him. Therefore the jurors were warranted in finding that the defendant made an attack which justified the deceased in making a counter-attack in self-defense. It is true that the defendant testified that the deceased advanced toward him and that he retreated, but the jurors were not required to believe this statement. They might well have discredited it because of the vital interest of the defendant in the result of the trial, and because it was controverted both by the testimony of Cornelison and by the dying declaration of the deceased. Instruction XIV was, therefore, relevant to the evidence. The jurors were also warranted in believing from the evidence that if the deceased made an assault it was brought about by defendant's own procurement in firing the first shot, and this is the state of facts referred to in instruction No. XV.

I agree that the trial court erred in admitting testimony by way of rebuttal to the effect that the witness had never seen the deceased carry a weapon, but I am satisfied that this error was not prejudicial. It is suggested in the prevailing opinion that this testimony had the effect of bolstering up the testimony of the same witness that the deceased was unarmed at the time of the homicide. It could not, in my opinion, have had this effect. A witness cannot corroborate his own testimony by restating the same fact in different language. These two statements were both made

by the same witness. If the first was true the second was probably also true, but immaterial. If the first was false the second was also false. The making of the second statement by the same witness added nothing to the weight or creditability to be accorded the first. Therefore its admission in evidence was but harmless error.

I am of the opinion that no prejudicial error was committed in this case and that the judgment should, therefore, be affirmed.

Lawlor, J., concurred.