[Crim. No. 8426. Second Dist., Div. Four. Nov. 20, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. MARGARET LOUISE McCARTNEY, Defendant and Appellant.

Ann Ruth Grant and Joseph W. Fairfield for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and H. Warren Siegel, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was convicted in a jury trial of murdering her son-in-law. The offense was fixed as murder in the second degree. The jury found that defendant was sane at the time of the commission of the crime. Motions for a new trial and to reduce the verdict to manslaughter were denied. She appeals from the judgment of conviction and from an order denying her motion for a new trial.

The following is a summary of the evidence presented: On October 23, 1961, the deceased, Marion Robert Bell (hereinafter referred to as Bell), who was estranged from his wife Billie Bell, went to the home of defendant, his mother-in-law, seeking the return of their infant son. Earlier the same day, Mrs. Bell had taken the baby from a sitter in whose care Bell had left the child and brought him to defendant's home. When Bell arrived at defendant's house his wife was not there, and defendant urged him to wait until her return before taking the baby. When Mrs. Bell returned, she and Bell began to argue over who should have custody of the child. The baby was at the time lying on a sofa in the living room. John McCartney, defendant's fiancé (now her husband), was sitting on the same sofa. Nancy, defendant's other daughter, was also in the living room standing near the sofa. Defendant was in the kitchen preparing dinner. The argument between Mrs. Bell and her husband increased in intensity to the point that they were screaming and yelling at each other. Defendant left the kitchen, entered the living room and went to a phone near a buffet to call the police. As she picked up the phone, Bell suddenly made a move to pick up the baby. A scuffle between Nancy and Bell ensued as each reached for the baby. McCartney got up from

the sofa and moved to the front door to keep Bell from leaving with the child. Bell struck Nancy in the back causing her to release her hold on the baby. He then bent over and picked up the child. As he turned and began to rise, with the baby in one arm and with the other hand raised, defendant dropped the phone, took a loaded gun from a drawer in the buffet and fired it once. The bullet struck Bell in the right side. He fell to the floor, dropping the child. Nancy caught the baby as Bell fell. No one in the room attempted to render medical aid and he died a short time after the shooting. Defendant called the police herself and then ordered McCartney and her daughters to leave the room, because ''it was none of their concern.'' When the police arrived defendant appeared calm and rational. One of the officers testified that he heard her say, ''I shot him, he was going to take the baby and I am glad.''

At the trial, two court-appointed psychiatrists testified that in their opinion defendant was conscious at the time of the shooting, and was not legally insane.

Defendant, testifying in her own behalf, admitted that she shot Bell. She related that, when the argument between Mrs. Bell and Bell got out of hand, she went to the living room intending to call the police. She did not remember taking the revolver from the buffet drawer, or firing the shot. ''I had the gun in my hand when it went off so I shot him. I don't recall opening the buffet drawer. I knew I shot Bob for the simple reason that I had the gun in my hand. I saw him strike Nancy, yes. You don't raise your arm up and bring it down full force unless you are going to strike something.''

Defendant testified that she had never fired a gun before. She stated that she did not even know how to load the gun.

Jane Frazer corroborating defendant's story, testified that she lived with defendant during the latter part of 1961; that when it was discovered there were prowlers around the home, defendant found a revolver (the one used in the shooting), which had belonged to her former husband. Miss Frazer testified that she had to load the gun because defendant did not know how.

Dr. McGinnis, a psychiatrist, testifying as a medical witness for defendant, stated that defendant was under great mental stress at the time of the shooting. It was his opinion that defendant did not intend to shoot the gun; that she was not conscious of actually firing the shot; and that she was legally insane at the time of the killing.

Defendant's younger daughter, Nancy, testified that the deceased struck her in the back as she attempted to get possession of the child just before the shooting; that when Bell picked up the baby and stood up, he was holding his right hand up with his fist clenched; that Mrs. Bell was about one foot away from him at the time. Nancy stated that it was Mrs. Bell and not defendant who said she wasn't sorry Bell was dead.

Mrs. Bell testified that she hated the deceased and that "after he was dead I said I wasn't sorry."

Defendant contends that there was insufficient evidence to support the finding of the jury that she was guilty of murder in the second degree. It is argued that the prosecution failed to establish that she acted with malice or that she entertained an intent to kill. Defendant maintains that, from the evidence, the jury should have found the killing to be justifiable. It is asserted by defendant that the most culpable offense of which she can be convicted is manslaughter.

In considering defendant's contentions we are bound by the following well established principles: "Before the verdict of a jury which has been approved by the trial court can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. We must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. If the circumstances reasonably justify the verdict, the opinion of the reviewing court that those circumstances might also be reconciled with the innocence of the defendant will not warrant a reversal. [Citations.]" (*People* v. *Ogg*, 159 Cal.App.2d 38, 48 [323 P.2d 117].)

Viewed in the light of these principles, "sufficient substantial evidence" was presented to sustain the verdict and judgment. The jury obviously rejected the defenses to the charge asserted by defendant, namely: (1) that she was unconscious at the time of the shooting and thus was incapable of committing the crime; (2) that she was not guilty by reason of insanity; (3) that the killing was justified within the meaning of Penal Code, section 197, in that the killing was committed in the lawful defense of her daughter.

As to the first two defenses, insanity and lack of consciousness, considerable medical testimony was given. As indicated, one doctor testified that in his opinion, defendant

was not conscious of what she was doing. It was his opinion she was temporarily insane. Two other doctors testified that, in their opinion, she was conscious, and that she was not legally insane when the shot was fired. The conflict of opinion was resolved by the jury against defendant. In finding defendant guilty, the jury impliedly found defendant was conscious and was not temporarily insane at the, time of the killing. This finding of fact, since supported by evidence, may not be disturbed on appeal. (*People* v. *Newland,* 15 Cal. 2d 678 [104 P.2d 778]; *People* v. *Ogg, supra,* 159 Cal.App.2d 38.) ▇ Nor, for the same reason, may we disturb the finding of the jury that defendant did not shoot the deceased in self-defense or in lawful defense of her daughter, for the jury could reasonably have found from the evidence presented that the deceased was not attempting to inflict great bodily injury upon defendant or any member of her family, and that there was no reasonable basis upon which to ground such a belief.

Neither is there any merit in defendant's contention that the prosecution failed to establish the existence of malice or that defendant had an intent to kill. ▇ As stated in *People* v. *Mears,* 142 Cal.App.2d 198, 204 [298 P.2d 40], "The implied malice as described in section 188 of the Penal Code requires no specific intent to kill, and the distinguishing characteristic between murder and manslaughter is malice rather than the presence or absence of an intent to kill." (See also *People* v. *Ogg, supra,* 159 Cal.App.2d 38, 50.)

▇ "When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; ... in such a case the verdict should be murder of the second degree. ... [Citation.]" (*People* v. *Howard,* 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Bender,* 27 Cal.2d 164, 179 [163 P.2d 8].)

▇ " '[W]here one assaults another violently with a dangerous weapon and takes his life, the presumption is that he intended to cause death or great bodily harm.' [Citation.] And where, as here, the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption to be drawn therefrom is that the assailant intended to take the life of the person attacked. [Citation.]" (*People* v. *Steward,* 156 Cal. App.2d 177, 185 [318 P.2d 806].)

Under the evidence adduced here, the jury could reason-

ably have found from the evidence that defendant shot the deceased to prevent him from taking his child from her home and from the possession of her daughter Mrs. Bell; that if he did in fact strike defendant's other daughter Nancy, as he reached for the baby, it was not with such force as would cause her bodily harm, but was merely to keep her from getting possession of the child. Supporting such a finding is the testimony of the police officer that defendant was heard to say, "I shot him, he was going to take the baby and I am glad."

"[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

The evidence was sufficient for the jury to have found that there was no "considerable provocation" for defendant's act and thus to have concluded that implied malice was established.

In addition, the jury could have reasonably concluded that defendant acted with an "abandoned and malignant heart." A dangerous weapon was used. An officer testified he heard defendant say she was glad she shot the deceased. In addition after the shooting, defendant made no effort to render medical aid. "In determining whether defendant's acts disclosed an abandoned and malignant heart, thus establishing implied malice, the jury was entitled also to consider defendant's conduct following the fatal injury. [Citations.] Defendant's failure to seek ... medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her." (*People* v. *Ogg, supra*, 159 Cal.App.2d 38, 51.)

Defendant contends that the court erred in allowing the prosecution to introduce evidence of the reputation of the deceased for peace and quiet since the defense had not attacked the reputation of the deceased. A plea of self-defense, or as in this case, defense of children, is not an attack upon that reputation. (*People* v. *Hoffman*, 195 Cal. 295, 311-312 [232 P. 974].) In the *Hoffman* case, *supra*, the trial court permitted evidence of the good reputation of the deceased to be introduced by the prosecution. The court held that this error alone necessitated a reversal of the judgment.

Here, the People, in effect, concede the trial court erred in

permitting the introduction of evidence of the good reputation of the deceased. It is contended however, that the objection may not now be raised not having been made at the trial. Counsel for defendant did make an objection, but solely on the ground that it was improper for a relative to testify as to reputation. This was not a valid objection and was properly overruled.

Defendant contends that the entire testimony of one of the two court-appointed psychiatrists who testified· at the hearing on the issue of defendant's insanity, should have been excluded because the psychiatrist made a statement on cross-examination which was allegedly prejudicial to defendant. On cross-examination, the following occurred:

"Q Doctor, in connection with your practice, have you ever made a diagnosis of temporary insanity?

"A No.

"Q Then you in fact don't accept such a medical diagnosis, do you?

"A I will not accept a temporary insanity as a diagnosis. This is a curtain behind which a lot of people hide and it is very hard to prove one way or another."

Defendant maintains that even though her defense counsel failed to make a motion to strike this testimony, the court should have excluded the testimony on its own motion. Defendant argues that when the witness stated he did not believe in temporary insanity, he in effect disqualified himself as being capable of rendering an opinion in the case. We reject this view. This was a question for counsel to argue and for the jury to weigh and determine. The jury was properly instructed that it might consider the opinion of an expert with the reasons stated therefor; that it was not bound to accept the opinion as conclusive, but should give to it the weight to which it found it to be entitled; that it might disregard any such opinion, if it found it to be unreasonable.[1]

Defendant contends that certain remarks made by the judge during the course of the trial prejudiced defendant's case in the eyes of the jury, denying defendant a fair trial.

The first such comment of the judge was made while defendant was on the stand testifying in her own behalf. The judge said: "Is that a reason for shooting somebody? Is that what you are trying to show?" The events leading up to this statement and immediately following were as follows: Defendant had testified that she had been under a "consider-

---

[1](CALJIC No. 56.)

able strain'' just prior to the shooting. Counsel for defendant asked defendant about events following her husband's death in March 1961, which caused her to be "upset and nervous.'' Objections to this line of questioning on the ground that it was irrelevant, incompetent and too remote were sustained. Then followed:

"Q. BY MISS GRANT (defense counsel): On the Friday just previous to October 23rd, 1961, were you in court at a contested hearing at which an attempt was made to remove you as an administratrix of your husband's estate?

"THE COURT: You are doing this in spite of the Court's reaction to these questions. They are not admissible.

"MISS GRANT: Your Honor, I am attempting to show the strain this defendant was under at the time.

"THE COURT: Is that a reason for shooting somebody? Is that what you are going to show?

"MISS GRANT: I am trying to show her state of mind at the time of the incident.

"THE COURT: All right, show it at the time of the incident.

"MISS GRANT: No further questions at this time.''

Later, the judge, out of the presence of the jury, indicated that he did not want to restrict counsel in the offering of defendant's testimony showing her state of mind as of a time close to the incident and having a bearing upon her state of mind at the moment of the shooting. The testimony was thereafter admitted in evidence.

It is apparent that the challenged remark was made by the judge in explanation of his ruling that what had happened in the probate court was too remote and could have had no bearing upon the shooting. Taken by itself the statement appears prejudicial but in context it does not. In his very next statement the judge indicated he would admit testimony showing defendant's state of mind at the time of the incident.

▆▆▆ The second comment to which defendant objects, was made during the course of the testimony given by defendant's medical witness. He testified that, in his opinion, defendant did not intend to shoot Bell, that the shooting occurred as a "reflex unconscious action,'' "an emotional explosion'' resulting from a buildup of an "intolerable mental strain.'' He then stated that, in his opinion, the gun was not pointed at anyone particular; that "it was a gun of extremely small caliber, a .22 short, a sort of pop gun that

adolescents use; that the fact that Bob died was due only to the chance the bullet struck a main artery.'' The court interrupted stating that it did not think the latter reasoning was properly a part of the diagnosis of defendant. Then followed:

''THE WITNESS: I was trying to evaluate the mental state of Mrs. McCartney on this night in terms of the facts of the situation and her behavior in it, your Honor.

''THE COURT: The fact is the gun was fired and a man was killed. That's about all there is to it, isn't it?

''THE WITNESS: I think there's an awfully lot more to it than that, your Honor.''

''THE COURT: I mean with respect to that particular thing. We are not considering now whether this gun did or did not kill this man. In other words, you will have to relate the factor of this gun to the opinion which you give with respect to her mental state at the time.''

It is apparent that the medical expert was attempting to relate the bearing that the particular type of weapon had upon defendant's state of mind; that the gun was not in size or appearance like, for example an Army .45, a weapon which by weight and appearance has a businesslike, lethal aspect; that the nature of this particular gun was such that one would not, in picking it up and waving it in the air or aiming it at a person, be likely to be thinking in terms of its ability to kill or maim someone. The doctor was saying that the fact that it did kill was only due to the misfortune of the bullet severing a main artery. Such reasoning was properly a part of the doctor's evaluation and opinion of defendant's mental state at the time of the shooting. Obviously, however, neither the doctor nor defendant's counsel made the point clear to the judge, who assumed that any testimony by the doctor concerning the question of cause of death invaded a field of inquiry beyond his function. The judge's choice of expression in halting the doctor at that point, however, was most unfortunate:

''THE COURT: The fact is that the gun was fired and a man was killed; that's about all there is to it, isn't it?''

This statement could be interpreted by the jury in any one of a number of ways to the prejudice of defendant. It might be interpreted that the judge believed that, irrespective of what defendant's state of mind was at the time, the only thing that mattered was that she fired the gun and the man was killed. ■ The danger here is as was stated in *Peo-*

*ple* v. *Mahoney*, 201 Cal. 618, 626-627 [258 P. 607]: "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant. It is unnecessary to cite the cases bearing on this subject. It is a fundamental principle underlying our jurisprudence." (See also *People* v. *Campbell*, 162 Cal.App.2d 776, 787 [329 P.2d 82]; *People* v. *Byrd*, 88 Cal. App.2d 188, 190-191 [198 P.2d 561].)

▉ Had the judge in the instant case merely indicated to the witness, or to counsel, that he believed the witness' answer was going beyond the scope of the question, the possibility of error could have been avoided.

▉ The third comment objected to by defendant was made shortly after the second remark. Defendant's medical witness was giving his analysis of the meaning behind certain statements made by defendant just after the shooting. He commented that the statement by defendant that "I shot Bob, I had the gun in my hand" was retrospective reconstruction on her part; as was her statement as to why she shot him, "It had to be because he was going to injure Nancy." The witness then stated he was explaining these statements because Mr. Carr, the deputy district attorney, had commented that he couldn't understand the difference in them. Then followed:

"MR. CARR: Are you analyzing Mr. Carr?

"THE COURT: Mr. Carr is in pretty good shape mentally so you can leave him out of it.

"MR. CARR: I was going to stipulate to that but I'd better not.

"THE COURT: I will give that as an expert opinion from my observation."

Defendant maintains that these statements prejudiced the jury against defendant and her counsel; that when the judge stated he could testify as an expert that the deputy district attorney was in good condition mentally, the jury was left with the impression that the court thought counsel for defendant was not adequate, while the deputy district attorney on the other hand was quite adequate.

We view this colloquy as having been intended as a bit of humor which, while better left unsaid, was not prejudicial to defendant.

Defendant argues that in the first two challenged comments of the judge, "The court washes out the entire case of the defense," that the plain inference to the jury was that nothing which happened could alter the fact that as the court put it "the gun was fired and a man was killed. That's about all there is to it, isn't it?"

In *People* v. *Byrd, supra*, 88 Cal.App.2d 188, at page 191, the court stated: "Our courts have many times reversed convictions in criminal cases because of intimations by the trial judge during the taking of testimony that the defendant or his witnesses was not believed by the judge. [Citations.]" The court further stated (p. 191): "... the task of an appellate court must in every such case be to weigh the intimation of the judge of his lack of credence in the testimony against the facts of the particular case and to determine whether under all the circumstances the defendant has suffered prejudice in the minds of the jury."

Applying this test to the instant case, we conclude that the second of the three challenged remarks of the trial judge was error. The jury could well have considered the remark to have indicated that the judge did not believe the defense being offered by defendant was a good defense; namely, that she did not intend to shoot Bell and that she was unconscious at the time the shot was fired. No objection to the judge's remark was interposed at the time the remark was made. Whether this is one of those cases in which the damage was irreparable once the remark was made and hence may be urged as error on appeal, is a question which would require close evaluation and scrutiny. (*People* v. *Byrd, supra*, 88 Cal.App.2d 188, 192.) However, because an error was made in the giving of instructions which requires a reversal, we need not determine the question; the situation is unlikely to recur at retrial of the case.

The record of the jury instructions given and refused was not included as part of the record on appeal. However, we have augmented the record on appeal and have before us all of the instructions requested and those given and refused.

Defendant requested, and the court refused to give, the instructions on involuntary manslaughter[2] and on due caution and circumspection.[3] "[A] defendant is entitled to instructions on this theory of the case as disclosed by the evi-

---

[2] CALJIC No. 308-B.

[3] CALJIC No. 309.

dence, no matter how weak." (*People* v. *Carmen*, 36 Cal.2d
768, 773 [228 P.2d 281].)

 "It is elementary that the court should instruct the
jury upon every material question upon which there is any
evidence deserving of any consideration whatever. [Cita-
tions.] The fact that the evidence may not be of a char-
acter to inspire belief does not authorize the refusal of an
instruction based thereon. [Citations.] That is a question
within the exclusive province of the jury. However incredible
the testimony of a defendant may be he is entitled to an
instruction based upon the hypothesis that it is entirely true.
[Citations.]" (*People* v. *Burns*, 88 Cal.App.2d 867, 871 [200
P.2d 134] and quoted in *People* v. *Miller*, 57 Cal.2d 821, 829
[22 Cal.Rptr. 465, 372 P.2d 297].)

 The evidence in this case would support a finding
that, in picking up the gun and pointing it in the direction
of the victim, defendant performed an unlawful act not
amounting to a felony; and that, while doing so, the gun was
accidentally fired. There was testimony that defendant had
never fired a gun before; that the deceased had defendant's
grandchild in his arms and that both of defendant's daugh-
ters were in close proximity to deceased at the time the shot
was fired; and that it was extremely unlikely that defendant
would intentionally have fired into their midst under such
circumstances. In addition, defendant's testimony of her lack
of recollection as to what occurred would support a finding
that the gun was fired accidentally. Further, Dr. McGinnis'
diagnosis of defendant's mental condition, which we have
discussed above, lent support to the theory of an accidental,
rather than an intentional, firing.

The court instructed on murder,[4] degrees of murder,[5]
murder in the second degree,[6] voluntary manslaughter,[7] the
duty of the jury to fix the degree at second degree murder if
in doubt between first and second,[8] and of manslaughter if in
doubt between murder or manslaughter,[9] unconscious act,[10]
and justifiable homicide in defense of a member of family.[11]

[4]CALJIC No. 301.
[5]CALJIC No. 302, 302A, 303 Alternate.
[6]CALJIC No. 305.
[7]CALJIC No. 308A, 310, 311 and 311A.
[8]CALJIC No. 305A.
[9]CALJIC No. 305A adapted.
[10]CALJIC No. 71C and 71D modified.
[11]CALJIC No. 321G, 327 and 327A adapted to defense of child.

While proper, none of these applied to involuntary manslaughter,[12] a verdict of guilty of which would have been warranted under the evidence if the jury believed it. This was reversible error. (*People* v. *Lewis*, 186 Cal.App.2d 585 [9 Cal.Rptr. 263]; *People* v. *Carmen*, 36 Cal.2d 768, 774-775 [228 P.2d 281].)

Judgment of conviction reversed and appeal from order denying motion for new trial dismissed.

Burke, P. J., and Kingsley, J., concurred.

---

[12]CALJIC No. 308B and 309.