[Crim. No. 11322. Fourth Dist., Div. One. Oct. 10, 1980.]

**THE PEOPLE, Plaintiff and Appellant, v.
ROBERT EUGENE LOVE, Defendant and Respondent.**

COUNSEL

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and George J. Du Borg, Deputy District Attorneys, for Plaintiff and Appellant.

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Elaine A. Alexander for Defendant and Respondent.

OPINION

WIENER, J.—A jury found Robert Eugene Love guilty of second degree murder. He moved for a new trial on the grounds the judge misdirected the jury in a matter of law (Pen. Code, § 1181, subd. 5) and the evidence was insufficient to support the verdict (Pen. Code, § 1181, subd. 7). His motion was granted on the former ground, but denied on the latter. The People appeal (Pen. Code, § 1238, subd. (a)(3)) contending the court's ruling is an abuse of discretion.

We conclude, where a court after reweighing the evidence independently determines there is sufficient credible evidence to sustain the verdict and denies a new trial motion, its ruling on jury instructions thereafter is solely a question of law. After our review of the factual record considered in the light most favorable to the judgment, we decide the jury was properly instructed. There was sufficient evidence to give CALJIC No. 8.31 "Second Degree Murder—Killing Resulting From Unlawful Act Dangerous To Life" and substantial evidence to support the verdict. We reverse the order granting the new trial and instruct the trial court to reinstate the verdict of second degree murder.

I.

*Factual Background*

On November 24, 1978, defendant killed Gail Smith. The facts follow:

*The Case-in-Chief*

Richard Tischbierek, the victim's stepfather, sold her a 1955 Buick Wildcat on November 2, 1978, on the condition defendant, her ex-

husband Floyd Smith and another were not to drive it. Nevertheless, defendant did drive the car and a week or two before the killing quarreled with the victim over its use.

Tammy Schaaf, who lived with Ruth Bland, was defendant's girl friend, the mother of his infant daughter and his unborn child. On November 24, 1978, defendant told the women he was going to pawn a gun in order to purchase some food for them. Early that evening the victim, driving her vehicle, arrived at the Bland residence, and picked up defendant, Shaaf and his child. They went to the home of defendant's father. While there, Schaaf saw defendant with a dark object which appeared to be a gun. At about 10:30 p.m., they left in the same car with defendant driving and went to Floyd Smith's house. Upon arrival, defendant got out of the car and went to the backdoor. The victim drove the car to the alley behind the house, honked the horn, parked the car and walked to the house.

Defendant appeared upset and belligerent when he entered the residence without knocking and announced he was looking for his brother. He had a small, flat, silver gun with a square butt similar to a .22 semiautomatic and not a revolver in his belt. When the victim entered the house she seemed upset and nervous. She gave Floyd Smith her keys, and said she thought defendant was going to try to take her car. She was later heard arguing with defendant near the backdoor saying she did not want him back in her car.

Schaaf had remained in the parked car. Although the windows were rolled up, she heard loud voices and saw defendant and the victim standing behind the car arguing and gesturing, not in a threatening manner, however. Defendant later returned to the car but found the keys were gone. Schaaf told him the victim had the keys. Defendant went back to the house. A short time later she heard a gunshot. Defendant turned and said, "I think I killed Gail." He told her to get out of the car. She then watched him drag the victim's body to the car. Soon afterward, Floyd Smith found the body in the back seat of the vehicle. Later that evening defendant called Bland and told her the victim was dead. She advised him to turn himself in.

Defendant was arrested on December 4, 1978. He told the police the whereabouts of the gun and the clothes he had been wearing on the night in question. A blue steel .357 Magnum revolver was found. An

autopsy showed the victim died of a gunshot wound to the head. The gun had been fired approximately three to six inches from her head with the bullet traveling in an upward manner. The ballistic tests were inconclusive since the bullet recovered from the victim was badly deformed and the gun in a rusty and dirty condition. The bullet, however, had been fired from a revolver. The car keys were removed from the victim at the coroner's office.

Smith testified he and the victim had a close and amiable relationship. She was pregnant with his child and intended to come back to him. On the morning in question, he had helped her retrieve her car, which had been left parked on a street with the keys locked inside.

*Defense*

Defendant claimed the shooting was an accident. He testified he and the victim had been on good terms as they had lived together at times and she had told him she was pregnant with his child. He further stated they did not argue over the car and on the evening of the shooting he was not in possession of the weapon until he discovered it hidden underneath the seat of the victim's car. Later that evening, when he arrived at Smith's home, he placed the weapon in his waistband because he was uncertain of Smith's disposition due to the animosity between Smith and the victim. He later returned to the vehicle and found the victim and her keys missing. When returning to the car the last time the victim called to him. As he stood behind the car removing the gun, she approached and asked, "What was that?" She then grabbed the gun and scuffled with him demanding, "Let me have it, I'm going to blow that son-of-a-bitch's head off." She explained, "Floyd had taken the keys." The parties continued to struggle until defendant stumbled and the gun went off.

Defendant thought she might still be alive and placed her into the car to take her to the hospital. He returned twice to the house trying to find the keys, but was afraid to tell the people there what had happened. Unable to find the keys, he retrieved the gun and fled. He said he failed to surrender because he was afraid the police would shoot him on sight.

His aunt testified on the evening in question she was at his father's house when he arrived and never saw him with a gun.

*Rebuttal*

The victim's mother testified that on November 11, 1978, the victim told her in defendant's presence her unborn child was not his, but Smith's. She further testified the victim and defendant occasionally stayed at the same house, but did not date or have a relationship. During September and October 1978, several individuals saw defendant armed with either a long-barreled, dark gun or a small, silver automatic. While Robert Hastin, the father of one of the victim's children, was in jail with defendant, the latter told him the shooting was an accident which occurred when the victim pulled the gun from her purse and he tried to stop her. Defendant denied the statement, noting the victim was not carrying a purse.

## II.

*Procedural Background*

In ruling on the motion for a new trial, the trial judge concluded he had misdirected the jury as a matter of law because the evidence did not warrant his giving CALJIC No. 8.31 (1974 rev.).[1] He reasoned it was wrong to instruct on implied malice where in his opinion defendant's behavior could not be legally characterized as an act done for a base, antisocial purpose with wanton disregard for human life as contained in CALJIC No. 8.31. He expressly denied the motion, however, on the ground of insufficient evidence finding in accordance with *People* v. *Robarge* (1953) 41 Cal.2d 628 [262 P.2d 14], there was "sufficient credible evidence to support the verdict [of second degree murder]." (*Id.,* at p. 633.)

■ Since the court's order granting a new trial *directly* and *clearly* disclosed the insufficiency ground was excluded as the basis for its ruling (*People* v. *Oliver* (1975) 46 Cal.App.3d 747, 752 [120 Cal.Rptr. 368]), we must view the entire evidentiary record in the light most favorable to the People and presume in support of the judgment the

---

[1]CALJIC No. 8.31 reads: "Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal. Rptr. 431, 606 P.2d 738].)

### III.

In order to convict a defendant of second degree murder, the prosecution must prove not only the defendant committed the fatal act, but that he did so with "malice aforethought." (Pen. Code, §§ 187, 189.) Penal Code section 188 defines implied malice as ". . .when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Despite this rather vague definition, more visceral than intellectual, the application of the definition in different factual settings has resulted in a body of law which effectively distinguishes second degree from first degree murder on the one hand and voluntary manslaughter on the other.

"The mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim. [Citation.] When a defendant "'with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death,'" he acts with malice aforethought. [Citations.]" (*People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911].) Malice is evidenced "by circumstances indicating that the killing was proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."' (*People* v. *Phillips, supra*, 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130].)" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 722-723 [112 Cal.Rptr. 1, 518 P.2d 913].)

The cases falling within these general statements are not stereotyped. The conduct may involve the striking of a child (*People* v. *Atkins* (1975) 53 Cal.App.3d 348, 359 [125 Cal.Rptr. 855]), assault with a deadly weapon (*People* v. *Goodman* (1970) 8 Cal.App.3d 705, 708 [87 Cal.Rptr. 665]), or a father's neglect in caring for his son (*People* v. *Burden* (1977) 72 Cal.App.3d 603, 619-620 [140 Cal.Rptr. 282]). In each such case where malice is found, there is an element of viciousness—an extreme indifference to the value of human life. (See Perkins

on Criminal Law (2d ed. 1969) § 1, p. 37.) It is where a defendant, free from any mental impairment or not acting in the heat of passion or on adequate provocation, makes a voluntary choice to commit a person-endangering act. (See Young, *Rethinking the Specific—General Intent Doctrine in California Criminal Law* (1975) 63 Cal.L.Rev. 1352, 1367.)

Defendant claims his conduct does not reach this proscribed level. In support of his argument he points to the absence of positive evidence— from eyewitnesses or defendant's own statements—that he intentionally shot the victim citing *People* v. *Harmon* (1973) 33 Cal.App.3d 308 [108 Cal.Rptr. 43]; *People* v. *Roy* (1971) 18 Cal.App.3d 537, 552-553 [95 Cal.Rptr. 884]; *People* v. *Lewis* (1969) 1 Cal.App.3d 698, 701-702 [81 Cal.Rptr. 900]; *People* v. *McCartney* (1963) 222 Cal.App.3d 461, 468-469 [35 Cal.Rptr. 256]; and *People* v. *McAuliffe* (1957) 154 Cal. App.2d 332, 337-338 [316 P.2d 381]. ■ Defendant's notion, however, that a second degree murder formula must always include evidence from either an independent eyewitness or from himself that the shooting was intentional is incorrect. The courts, in taking the Legislature's definition, have over the years cautiously and successfully drawn the fine line between cases involving conduct consonant with the punishment to be imposed for second degree murder and those which are properly lesser crimes.

The court found there was sufficient credible evidence to support the verdict of second degree murder. We "must view the evidence in a light most favorable to [the People] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] The People may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he committed it. [Citations.] If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.]" (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; see also *People* v. *Johnson, supra,* 26 Cal.3d 557, 575-577.)

■ The prosecution's theory developed during trial and argued to the jury, was that defendant consistently fought with the victim over the

use of her car. On the night of the killing, after she refused to let him use it, he tried to persuade her by placing a loaded gun to her head. When she continued to argue, he pulled the trigger. The jury, in rejecting defendant's explanation, inferred from all the evidence, including the powder marks on the victim's head and from defendant's statements that the prosecution theory was correct in describing what actually occurred. Defendant's flight in avoiding apprehension also "affords a basis for an inference of consciousness of guilt and constitutes an implied admission." (*People* v. *Brunk* (1968) 258 Cal.App.2d 453, 455 [65 Cal. Rptr. 727]; *People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 543 [88 Cal.Rptr. 235].) His failure to seek medical aid for the victim after the shooting is probative he conducted himself "' with an "*abandoned and malignant heart*"'" (*People* v. *Burden, supra*, 72 Cal.App.3d 603, 621; *People* v. *McCartney, supra*, 222 Cal.App.2d at p. 461.) And, as the trial court noted, an intent to kill may be additionally inferred from the inconsistencies in defendant's testimony, "the argument that occurred that night, the exact physical manner in which the gun was fired and the positions of the parties . . ." as well as the defendant's inculpatory statement to his girl friend, "I think I killed Gail." There was sufficient evidence to warrant the giving of CALJIC No. 8.31 and substantial evidence to support the verdict.

## IV.

Defendant claims CALJIC No. 8.31 is deficient in not tracking the quotation from *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal. Rptr. 225, 414 P.2d 353], approved in *People* v. *Sedeno, supra*, 10 Cal.3d 703, 719, for the instruction in its present form fails to tell the jury that defendant's death-causing act must be performed by him intentionally and with knowledge of the specific risk involved. In other words, defendant argues he may not be guilty of second degree murder unless he acted *deliberately* with *actual, subjective* awareness of the risk involved.

Defendant's argument is intellectually sound only if the statement from *Phillips* describes the sole factual setting for second degree murder. As we have attempted to explain, however, the continuum of death-causing behavior for which society imposes sanctions is practically limitless with the gradations of more culpable conduct imperceptibly shading into conduct for the less culpable. Our high court has drawn this line placing in the more culpable category not only those deliberate

life-endangering acts which are done with a subjective awareness of the risk involved, but also life-endangering conduct which is "only" done with the awareness the conduct is contrary to the laws of society. Although behavior in the latter category may not be as morally heinous as the former, the difference in culpability does not require the latter crime to be legally shifted into manslaughter slots.

The blameworthiness of death-causing conduct which can legitimately be described as involving a high degree of probability that it will result in death where accomplished with an awareness of one's societal duties is not disproportionate to the sanctions which may be imposed for second degree murder. One's felt sense of justice is not moved, much less outraged, when such life-endangering and death-causing conduct is labeled as second degree murder.

■ In recognizing these precepts, a three-pronged inquiry was fashioned in *People v. Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], as the proper procedural requisite for a finding of implied malice. "First, was the act or acts done for a base, antisocial purpose? Second, was the accused aware of the duty imposed upon him not to commit acts which involve the risk of grave injury or death? Third, if so, did he act despite that awareness? The first determination is expressly required in accordance with the definition of implied malice, and the second and third determinations are required relative to the question of 'wanton disregard' also in accordance with the definition of implied malice." (*Id.*, at pp. 759-760.)

CALJIC No. 8.31 satisfies *Poddar*. Accordingly, there was no instructional error. (See also *People v. Odom* (1980) 108 Cal.App.3d 100, 113 [166 Cal.Rptr. 283]; *People v. Atkins, supra,* 53 Cal.App.3d 348, 358-359; CALJIC No. 8.11.[2])

---

[2]CALJIC No. 8.11 (1974 rev.) as given provides: "'Malice' may be either express or implied. [¶] [Malice is express when there is manifested an intention unlawfully to kill a human being.] [¶] [Malice is implied [when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, anti-social purpose and with a wanton disregard for human life, by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness] [or] [when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life].] [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] 'Aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

## V.

■ Defendant also says the inference of malice drawn by the jury violates his due process rights for it allows the state to presume an essential element of murder thereby relieving it of its duty to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068, 1072]; *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881].) This issue, although of considerable interest (see, e.g., Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law* (1979) 88 Yale L.J. 1325), is one not present here. Although the word "presumption" is used in many of the cases, what is truly meant is that a shorthand label—malice—may be given to the actor's state of mind when his conduct reaches a certain antisocial level. The trier of fact, using a circumstantial-evidence-reasoning process involving the application of logic, draws a permissible inference of malice from the facts proved at trial. This permissible inference is different from and should be distinguished from a presumption which may relieve the People from satisfying its burden of proof. (See Evid. Code, §§ 600-607; Jefferson, Cal. Evidence Benchbook (1972) Presumptions, § 46.1, p. 796.)

CALJIC No. 8.50 in its 1975 revised form as required by *Mullaney* v. *Wilbur, supra*, was given to the jury. They were told that "to establish that a killing is murder and not manslaughter, the burden is on the State to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel." There was no impermissible shifting of the People's burden.

*Disposition*

The order granting the motion for the new trial is reversed. The verdict of second degree murder is reinstated and the case remanded for sentencing.

Brown (Gerald), P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied November 3, 1980, and respondent's petition for a hearing by the Supreme Court was denied December 4, 1980. Bird, C. J., was of the opinion that the petition should be granted.