Filed 2/6/14  P. v. Patterson CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B245169 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA373124) |
| v. | |
| RANDOLPH PATTERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Drew E. Edwards, Judge.  Affirmed.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Randolph Patterson appeals from a judgment of conviction for the murder of Frankie Ogburn. Patterson contends the trial court erred when it refused to instruct the jury on the lesser included offense of voluntary manslaughter. Patterson also contends the trial court erred in imposing $240 restitution and parole revocation fines. We affirm the judgment.

## FACTS

Kimberly Rodrigues was in an on-again, off-again relationship with Frankie Ogburn in the summer of 2010. They had a son together, who was almost two years old at the time of the incident. Rodrigues also had two daughters, who were 10 and 8, from a different relationship. On June 30, 2010, Rodrigues and Ogburn were in the car with the three children when they began to argue. After they arrived at Ogburn's home, he transferred the children to Rodrigues' car and continued the argument with Rodrigues in his car. Rodrigues had arranged for Ogburn to purchase a prescription for oxycontin so he could sell the pills to pay for their son's second birthday party. When they discovered the prescription was fake, Ogburn became upset and demanded Rodrigues tell him the location of the person who sold the prescription to him. Rodrigues called her cousin to ask him about getting Ogburn's money back. Rodrigues' cousin refused.

Ogburn then began to punch Rodrigues. He also tried to keep her in his car. Rodrigues swung her purse at Ogburn and split his lip in an attempt to get away. Ogburn followed her out of the car and took her phone. He offered to return her phone if she paid him the $400 he lost in the scheme. He told her she could retrieve the phone from his mailbox if she put $400 there in exchange. Rodrigues drove the children to her aunt's house in Inglewood and left them there. Rodrigues then called Ogburn's mother to tell her what had happened. Ogburn's mother told Rodrigues she should calm down and that she should not give him her "rent money."

Rodrigues drove back to Ogburn's home to retrieve her cell phone from the mailbox. Ogburn arrived soon afterwards to find that she had not put the $400 in the mailbox. He became incensed. He had a "tussle" with Rodrigues and threw her phone into the middle of the street, breaking it. When she tried to leave in her car, he jumped in

2

front of it and kicked her windshield out. After he finally got off the car, Rodrigues drove to a nearby police station to report the incident.

While Rodrigues was at the police station, Natasha Kentish, Rodrigues' sister, learned of the incident and became enraged. She told her boyfriend, Patterson, and her son, Devon, about the incident. They agreed to confront Ogburn. Patterson's daughter, Yvette Posey, reluctantly drove them to Ogburn's home. When they arrived, Patterson remained in the car while Kentish and Devon knocked on Ogburn's door. Ogburn was not there and they returned to the car. As Posey began to pull away, Ogburn turned into the driveway and drove behind the apartment building. Kentish and Devon got out of the car to go after Ogburn. Shortly afterwards, Patterson followed them.

Posey waited outside. After a few minutes, she heard a sound like a firecracker or gunshot. Kentish and Devon came running up to the car. Kentish shouted that Patterson had just shot Ogburn. Posey looked back to the apartment building and saw her father walk down the driveway. He got into the car and Posey drove off. While she drove, she yelled at him for getting her involved. Kentish asked for the gun and Patterson passed it to her. Kentish put the gun underneath her. By that time, the police were following them. The gun was recovered from the floorboard under the front passenger seat, where Kentish had been sitting.

Patterson's statement to the police at the scene was recorded[1] and played for the jury at trial. In the recording, Patterson admitted to killing Ogburn. He explained that he shot him because "he was jumping on my sister-in-law, and he was holding her motherfucking hostage." Patterson stated that he "walked up to him like a motherfucking man and he started talking to me like I was a bitch and I showed him what a bitch is." Patterson denied he intended to shoot Ogburn, only bringing the gun because Ogburn was a gangbanger, but "he started talking that motherfucking shit to me. And when he started that motherfucking shit to me, I did what the fuck I had to do . . . And since he wanted to be a bitch, I'm going to treat him like a bitch."

---

[1] Patterson was read his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and waived them.

Patterson was *Mirandized* for a second time at a videotaped interview at the police station. He again admitted to shooting Ogburn. That tape was also played to the jury at trial. Patterson explained that Devon called him to tell him that Rodrigues was being held and beaten by Ogburn. He "went over there with the intention on not escalating the situation but coming to some kind of understanding with this idiot about putting his hands on my sister-in-law." He admitted, however, that he intended "to beat his motherfucking ass." When they arrived at Ogburn's home, he stayed in the car because neither Ogburn's nor Rodrigues' car was there. When Ogburn arrived, he got out of the car because he did not want Natasha to "get beat up" or Devon to get "mixed up in any bullshit."

When Patterson confronted Ogburn about what happened with Rodrigues, Ogburn replied, "Fuck you." Patterson told Devon "to sprint off" because he knew the situation was about to escalate. Ogburn continued to curse at him after Patterson showed him the gun in his waistband. Ogburn then dared him to "[g]o ahead and blast" him. Patterson shot him in the chest. Patterson explained, "[h]e asked me to do it and I did it because I don't appreciate no man bullying no female. He's a young-ass gangbanger nothing ass bully." At the time Patterson shot him, Ogburn was standing in front of him next to his car. Patterson noticed Ogburn had something in his hand but he "[didn't] know what the fuck he had." While he was in custody, Patterson told his daughter that he shot Ogburn in the chest because Ogburn was arguing with him and "gang-banging" him.

Patterson was charged with the murder of Ogburn. An amended information alleged one count of murder pursuant to Penal Code section 187, subdivision (a)[2] with additional firearm enhancement allegations pursuant to section 12022.53, subdivisions (b)-(d). The information further charged Patterson with a second count of possession of a firearm by a convicted felon in violation of section 12021, subdivision (a)(1) and a third count of possession of ammunition, in violation of section 12316, subdivision (b)(1). It was further alleged that Patterson suffered two prior serious felony convictions within

---

[2]     All further section references are to the Penal Code unless otherwise stated.

4

the meaning of section 667, subdivision (a)(1), and that he had suffered two prior serious or violent felony convictions within the meaning of the Three Strikes law. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

At trial, Rodrigues and Posey testified to the events described above. Ogburn's neighbor, Sean Nunez, confirmed their testimony. He observed Ogburn's fight with Rodrigues. He later saw three people, whom he identified as Kentish, Devon and Patterson, walk to the back of Ogburn's apartment building. He heard a shot ring out. He then saw Patterson walk back to a black truck with a gun in his hand. Nunez called 911 and when he walked to the back of the apartment building, he saw Ogburn lying against his back door. Officers responding to the incident found him on the ground next to the driver's side door of a car parked in the driveway. Rock cocaine was found in the car.

The jury found Patterson guilty as charged on all three counts and also found true the firearm enhancement allegations. Patterson waived his right to a trial on the prior conviction allegations and admitted to a prior burglary conviction, which qualified as a prior serious felony conviction under section 667, subdivision (a)(1) as well as a strike under the Three Strikes law. In exchange for his admission of the prior conviction, the remaining prior conviction allegations were dismissed by the trial court. The trial court sentenced Patterson to a total of 55 years to life in state prison and ordered him to pay $7,288.60 in restitution to the Victim Compensation and Government Claims Board as well as $500 in restitution to Jill Ogburn. The trial court also imposed a $240 restitution fine and a $240 parole revocation fine that was stayed pending the successful completion of parole. Other fines and fees were imposed. Patterson appealed.

## DISCUSSION

## I. Voluntary Manslaughter Instructions

At trial, Patterson requested jury instructions on voluntary manslaughter based on theories of heat of passion and imperfect self-defense. The trial court denied the request, finding no substantial evidence to support either theory. On appeal, Patterson contends the trial court's ruling was in error because evidence of Ogburn's treatment of his "sister-

in-law" and Ogburn's hostile behavior towards Patterson supported an instruction for voluntary manslaughter based on heat of passion or provocation. He also contends that Ogburn's penchant for violence, his gang affiliation and the fact that he held "something" in his hand supported a theory of imperfect self-defense. We disagree.

A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) Substantial evidence is evidence from which a jury composed of reasonable persons could conclude that the lesser offense, but not the greater, was committed. (*People v. Barton* (1995) 12 Cal.4th 186, 194-195 (*Barton*).) In determining whether substantial evidence exists to support instruction on a lesser included offense, we do not evaluate the credibility of witnesses. (*People v. Manriquez* (2005) 37 Cal. 4th 547, 585 (*Manriquez*).) We independently review whether the trial court erred by failing to instruct on a lesser included offense. (*Id.* at p. 584.)

Manslaughter is a lesser included offense of intentional murder. (*Breverman*, *supra*, 19 Cal.4th at p. 154.) In order to convict a person of second degree murder, the prosecution must prove not only that the person committed the fatal act but that he did so with "malice aforethought." (*People v. Love* (1980) 111 Cal.App.3d 98, 105.) Manslaughter, on the other hand, is defined as "the unlawful killing of a human being without malice." (§ 192.) The element of malice is what differentiates murder from manslaughter. Malice is absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense, (*In re Christian S.* (1994) 7 Cal. 4th 768, 783). These circumstances negate malice when a defendant intends to kill. (*Barton*, *supra*, 12 Cal.4th at p. 199; *People v. Lee* (1999) 20 Cal.4th 47, 58-59 (*Lee*).)

**A. Heat of Passion Instruction**

The heat of passion requirement for manslaughter has both an objective and a subjective component: (1) the defendant must actually and subjectively kill under the heat of passion and (2) "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and

6

circumstances . . . ." (*People v. Logan* (1917) 175 Cal. 45, 49; *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327.) "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' [Citation.]" (*People v. Wickersham, supra*, 32 Cal.3d at p. 326.) The provocation which incites the defendant to homicidal conduct in the heat of passion may be physical or verbal, although verbal provocation "must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee, supra*, 20 Cal.4th at p. 60.)

Patterson contends that there was substantial evidence from which the jury could reasonably infer the killing was committed in the heat of passion. In particular, Patterson argues he was provoked by Ogburn's treatment of Rodrigues, whom he considered to be family. He also asserts he was provoked by Ogburn's profanity-laced tirade against him. We find neither circumstance supported a heat of passion instruction to the jury.

There is no evidence that Ogburn's treatment of Rodrigues actually incited Patterson's passions. Indeed, the record shows that Patterson was calm throughout the incident. Patterson told the police that he initially stayed in the car because it appeared the situation had been resolved since neither Rodrigues' nor Ogburn's car was at Ogburn's house. Posey testified that Patterson did not appear distressed, even after he shot Ogburn. While Kentish and Devon raced back to the car, Posey noted that Patterson walked slowly back and adjusted his coat. Patterson admitted to the police he had no intention of escalating the situation when he agreed to confront Ogburn, but merely "coming to some kind of understanding with this idiot about putting his hands on my sister-in-law." The record shows that the subjective component of the heat of passion theory clearly was not satisfied.

Neither are we convinced that Ogburn's profane tirade against Patterson was sufficient to provoke a reasonable person under the objective standard. Ogburn told Patterson, "Nigger, fuck you bitch ass motherfucker" and dared Patterson to "blast" him. In *Manriquez,* the victim called the defendant "a mother fucker," asked him whether he had a gun, and dared him to use it. (*Manriquez, supra,* at pp. 585-586.) The high court

7

held these actions "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment." (*Id.* at p. 586; see also *People v. Oropeza* (2007) 151 Cal.App.4th 73, 76, 83 [mutual yelling and offensive hand gestures exchanged between two cars on highway did not constitute adequate provocation for passenger of one car to shoot at other car].) Even if we accept that Ogburn's behavior towards Patterson incited Patterson to rage or passion, *Manriquez* tells us that it was insufficient to cause an average person to become so inflamed as to lose reason and judgment.

For this reason, we do not credit Patterson's reliance on *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*). In *Thomas*, the appellate court found that the evidence was sufficient to support a finding that the defendant's passion was aroused and his reason obscured when he shot the victim. As a result, the trial court erred when it refused to instruct the jury on voluntary manslaughter based on a theory of heat of passion. (*Id.* at pp. 633, 645.) The defendant in *Thomas* got into a physical altercation with the victim's friends, who overpowered him. The defendant was crying and testified that he was afraid, nervous, and not thinking clearly. (*Id.* at p. 645.) The defendant then retrieved an assault weapon and pulled the trigger when the victim appeared to lunge at him. (*Id.* at pp. 645-646.) Unlike *Manriquez,* the *Thomas* court did not expressly address the objective component of a heat of passion instruction, merely the subjective one. Because the objective component has not been fulfilled in this case, the *Thomas* case is not controlling; the trial court was not required to instruct the jury on voluntary manslaughter based on a theory of heat of passion.

### B. Imperfect Self-Defense

There are two types of self-defense under California law: "perfect" self-defense and "imperfect" self-defense. (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1198-1199).) Both types require that the defendant actually believe he was in "imminent danger of death or great bodily injury . . . ." (*Randle, supra*, at p. 994.) If that belief is reasonable "'from the point of view of a reasonable person in the [defendant's] position,'" the

defendant has acted in perfect self-defense and the homicide is justified and not a crime at all. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083, quoting *People v. McGee* (1947) 31 Cal.2d 229, 238; § 197, subd. (1).) If that belief is subjectively reasonable, but not objectively reasonable, it still negates the malice element of murder. If the defendant is guilty, at most it is of the lesser-included offense of voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 773.) "Imperfect" self-defense is accordingly not a defense, but rather an instruction on a lesser-included offense. (*Manriquez, supra*, 37 Cal.4th at p. 581.)

The record does not support a finding that Patterson actually believed he was in imminent danger of death or great bodily injury. There was no indication Ogburn had a gun or any weapon. The police did not find Ogburn with a gun or weapon. Ogburn never brandished a weapon during the incident with Rodrigues. Although Patterson said Ogburn held "something" in his hand, he acknowledged he did not know what it was and he never claimed it was a weapon. Despite Patterson's belief that Ogburn was violent, Ogburn did not become physically aggressive with Patterson. When Patterson showed Ogburn his gun in his waistband, Ogburn did not brandish a weapon in response, nor did he try to attack Patterson. Instead, Ogburn taunted Patterson with profanity and dared him to shoot him. This evidence precludes any argument that Patterson was actually in fear of imminent harm or death.

## II.    Restitution and Parole Revocation Fines

At sentencing, the trial court imposed various fines and restitution. Among them, the trial court ordered Patterson to pay a "restitution fine of $240." The court also ordered, "If Mr. Patterson were to be placed on parole and violate, there is an additional fine of $240." Patterson contends the trial court erred when it imposed these fines because the trial court mistakenly believed the minimum restitution fine to be $240 when it was $200.

Section 1202.4 provides: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."

(§ 1202.4, subd. (b).)  "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense.  If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012 . . . ."  (§ 1202.4, subd. (b)(1).)  Prior to 2012, the minimum fine under section 1202.4 was $200.  (former § 1202.4, amended by Stats. 1996, ch. 629, § 3.)  A restitution fine under section 1202.4 is subject to the ex post facto clause of the Constitution.  (*See People v. Souza* (2012) 54 Cal.4th 90, 143.)  Thus, any restitution fine imposed under section 1202.4 was subject to the $200 minimum applicable at the time of the conviction rather than the $240 minimum applicable at the time of sentencing.

Patterson surmises "the court intended to impose the minimum fine permitted by law, and that minimum was $200 for each fine."  Accordingly, Patterson urges us to reduce the restitution and parole revocation fines to $200 each from $240 each.  Nowhere in the record, however, does the trial court indicate it intended to impose the minimum fine under section 1202.4.  The trial court is provided wide latitude under section 1202.4 to impose a fine between $200 to $10,000.  Patterson does not argue that the trial court abused its discretion in imposing the $240 fines.  Patterson has presented no supported reason, beyond conjecture, to reduce these fines.  As a result, we decline to do so.

## DISPOSITION

The judgment is affirmed.

BIGELOW, P. J.

We concur:

RUBIN, J.

GRIMES, J.

10